## COMMONWEALTH vs. HENRY K. BOATENG.

Worcester. October 11, 2002. - January 21, 2003.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Insanity. Mental Impairment. Evidence,* Competency, Exculpatory, Failure to produce evidence, Photograph, Consciousness of guilt, Voluntariness of statement. *Homicide. Practice, Criminal,* Disclosure of evidence, Voluntariness of statement, Instructions to jury, Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel. *Malice. Assault with Intent to Murder.*

In the circumstances of a criminal case in which defendant's trial counsel, on the first day of trial, withdrew his previously filed motion for a competency hearing as moot, and informed the judge that nothing had occurred since the competency hearing held one week earlier to warrant a new inquiry, there was no substantial question that required the judge to hold a competency hearing sua sponte. [503]

A criminal defendant was not entitled to a voluntariness hearing with regard to statements he made to the victim and her mother during his extended assault on the victim and her child; further, although the trial judge erred in not conducting such a hearing to determine the voluntariness of the defendant's statements to the police soon after the attacks, this court concluded that the failure of the judge to conduct the voluntariness hearing did not, in the circumstances, create a substantial likelihood of a miscarriage of justice. [503-506]

This court rejected a criminal defendant's claim that the failure of police to preserve certain exculpatory evidence was official misconduct that prevented him from presenting an effective defense, where the prosecution was under no duty to gather evidence that might be potentially helpful to the defense; further, the judge did not preclude the jury from considering the alleged inadequacy of the police investigation, and there was no error in the judge's failure to give the jury an instruction on the issue in accordance with *Commonwealth* v. *Bowden,* 379 Mass. 472 (1980). [506-507]

At a murder trial, the judge's admission in evidence of numerous autopsy photographs of the infant victim's body was not unduly inflammatory or prejudicial, where the photographs in general, although graphic, had important value on the issue whether the killing had been committed with extreme atrocity or cruelty, and where a single postautopsy photograph was a reasonable attempt by the prosecution to convey the brutality of the crime in a visually efficient manner. [507]

At a criminal trial, the judge properly denied the defendant's motion for a required finding of not guilty on the charge of murder in the first degree, where there was sufficient evidence for the jury to find that, despite the

defendant's mental illness, he had committed murder with extreme atrocity or cruelty. [507-508]

At a criminal trial, the judge did not err in instructing the jury on consciousness of guilt, where the instruction did not impermissibly bolster the Commonwealth's expert's testimony, but informed the jury that if they agreed with the expert that the defendant's actions subsequent to the crimes committed suggested a guilty mind, they could use that consciousness of guilt evidence as part of their analysis. [508]

In a murder case in which defense counsel, before trial, informed the judge that he represented a prosecution witness, the medical examiner, in an unrelated civil case to which the medical examiner was a party, there was no substantial likelihood of a miscarriage of justice created by the dual representation, where the trial judge conducted an inquiry of the defendant to determine whether his decision to continue with his trial counsel was intelligently made and whether the defendant knowingly and voluntarily assented to the dual representation; and where defense counsel's conflict of interest was only potential, not actual, in that the defendant was not prejudiced by counsel's failure to present an alternative theory to rebut the conclusions of the medical examiner, whose testimony regarding cause of death was peripheral to the defendant's defense of insanity and in many ways supported the defense theory of insanity, and in that the potential conflict was brought to the judge's attention in a timely fashion. [508-512]

At a murder trial, defense counsel was not ineffective in deciding not to request a contemporaneous competency hearing, where the defendant presented no evidence whatsoever to contradict counsel's statement to the court on the first day of trial that the defendant's condition had not changed in the intervening week since a prior competency hearing had taken place. [512]

Any added benefit that could have been provided by the testimony of three additional medical experts presented by a criminal defendant at a hearing on a motion for a new trial was not sufficiently great or certain as to render the defendant's trial counsel's presentation of an insanity defense ineffective, nor was any such added benefit likely to have influenced the jury's conclusion as to the defendant's guilt. [512-514]

At a murder trial, the defendant's trial counsel was not ineffective for failing to object to the judge's instruction to the jury on malice aforethought, where the judge's instruction that omitted the words "specific" and "general" to distinguish the different forms of intent that comprise malice was not fatal in light of the judge's sufficient explanation of the Commonwealth's burden in proving malice, where the judge's removal of the "reasonably prudent person" clause from the third prong of malice instruction was not erroneous since the resulting instruction still conveyed the definition, and where the jury were properly informed of their right to consider the defendant's mental state on the subject of malice. [514-516]

At a murder trial, the defendant's trial counsel was not ineffective in failing to object to the judge's instruction to the jury on involuntary manslaughter where, although the judge did not include in his instruction a reprise of his earlier statement that the jury could consider the defendant's mental impairment in coming to their conclusion, the instructions as a whole conveyed to the jury that they could consider such an impairment; further, even if the instruction was insufficient in that regard, it did not create a substantial

likelihood of a miscarriage of justice, as the defendant was convicted of murder, not manslaughter. [516]

At a criminal trial, the judge erred in instructing the jury on the charge that the defendant assaulted a victim with the intent to murder her, and that error created a substantial risk of a miscarriage of justice, where the judge's failure to include the proper definition of malice in his instruction to the jury on assault with intent to murder created a substantial likelihood that the defendant was convicted of a crime of which he might have been acquitted had the proper instruction been given. [516-518]

INDICTMENTS found and returned in the Superior Court Department on December 9, 1992.

The cases were tried before *Herbert F. Travers, Jr.,* J., and a motion for a new trial, filed on December 7, 1998, was heard by *Daniel F. Toomey,* J.

*Kenneth G. Littman* for the defendant.

*Anne S. Kennedy,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In this opinion we affirm the convictions of the defendant, Henry K. Boateng, on charges of murder in the first degree, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and assault and battery. We reverse the conviction of armed assault with intent to murder. After conducting our own review of the evidence and proceedings pursuant to G. L. c. 278, § 33E, we find no basis to grant further relief.

1. *Background.* We recite the facts as the jury could have found them. Boateng and Alecia Moore (Moore) met in Worcester in June, 1991, and began to date. In January, 1992, Boateng briefly moved to Amherst to attend classes at the University of Massachusetts, but soon moved back to Worcester. At about the same time Moore told him that she was pregnant with his child. In the fall of 1992, Moore moved into an apartment and Boateng came to live with her soon thereafter. A week later, their son, Jameel, was born.

As a condition of Boateng's moving in with Moore, she had required him to find a job or go back to school. He was unable to hold steady employment, however, and on both the night of October 24 and the morning of October 25, 1992, she told him that he would have to move out of the apartment.

The discussion on October 25 occurred in Boateng's bedroom, which was down the hall from where Moore and five week old Jameel slept. As Moore left the room following the conversation, Boateng sprang up, threw Moore to the floor, and yelled, "I'm going to kill you!" as he strangled, hit, and kicked her. Although Moore's memory of the succeeding events was not precise, she testified that over the next two hours Boateng administered a long series of assaults on her, including some with a stick. At some point during this assault, Boateng stated that "I'm going to get the baby," and retrieved Jameel from his crib. He threw Jameel onto the floor and began to kick and strangle Jameel, kicking Moore in the face when she tried to stop him. He then took the baby and put it back in its crib. Jameel died as the result of the injuries suffered in this assault.

Moore managed to crawl to her room and lie on the bed. While she was still lying down, Boateng produced a knife and held it over Jameel in his crib. He then briefly did the same to Moore. Eventually the telephone rang, and Boateng spoke with Moore's mother, who wanted to speak to Moore. Boateng told her that Moore was out doing laundry; he then hung up and ripped the telephone cord out of the wall. As Moore had just been to her house the day before to do laundry, her mother's suspicions were raised and she and her other daughter drove to Moore's apartment to investigate. When no one answered at the door, she contacted the police. She and her daughter also yelled for Moore from outside the house. When Boateng heard them, he became disconsolate, went into the bathroom and drank from a container of bleach, saying that he would not go to jail. He did manage, however, to prevent Moore from going downstairs to reach her mother and sister.

The police soon arrived. Moore was taken to a hospital while a detective read Boateng the Miranda warnings and questioned him about what had happened. Boateng responded that he and Moore had gotten into a fight.

At trial, Boateng's defense was based on insanity. Boateng presented evidence to show that, periodically since 1988, he had been receiving treatment for a psychiatric disorder that had at different times been diagnosed as dysthymia, or mild depression; major depression; major depression with psychotic features

and schizoaffective disorder; that he had been prescribed and had taken antidepressant and antipsychotic drugs that had had varying effects on his mood and thought processes but that had often controlled his psychosis; and that the combination of medications and illness had prevented him from being able to maintain a job or receive a higher education.

Dr. David Rosemarin, a psychiatrist, was called as a defense witness. He testified that on the day in question Boateng was likely in the grip of psychosis, feeling under the control of a spirit and hearing voices mocking him and telling him to kill himself. Rosemarin related that Boateng had told him that after he assaulted Moore but before attacking Jameel, he had responded to these voices by mixing all of his antidepressant and antipsychotic medication and taking it in one dose. While Rosemarin could come to no conclusion regarding Boateng's state of mind during his attack on Moore, it was his opinion that Boateng had suffered a hallucination causing him to believe that Jameel was some sort of evil creature or cat who would kill him if he did not kill it first. It was Rosemarin's further opinion that Boateng was not criminally responsible within the meaning of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546 (1967).

The Commonwealth called as its expert Dr. Marc Whaley, who acknowledged that Boateng suffered from major depression with possible psychotic features and that antipsychotic drugs had helped him to function. Nevertheless, Whaley opined that Boateng's actions on October 25, 1992, displayed a rationality that belied any claim of actual insanity, and concluded that Boateng had sufficient mental capacity to be criminally responsible for his actions on that date.

The jury convicted Boateng of the murder of Jameel with extreme atrocity or cruelty.[1] For the attack on Moore, they convicted him of armed assault with intent to murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and assault and battery. Boateng appealed and subsequently filed a motion for a new trial based on ineffective assistance of counsel. The appeal was stayed pend-

---

[1] The case was submitted to the jury on two theories of murder in the first degree: premeditation and extreme atrocity or cruelty. The jury rendered their verdict of guilty based on the latter theory.

ing the outcome of the motion. The motion judge, who was not the trial judge, conducted an evidentiary hearing at which Boateng's new counsel called three new expert witnesses. Boateng claimed that these witnesses, if they had been called to testify at trial, would have presented a stronger case for insanity and that trial counsel's failure to call them was manifestly unreasonable, constituting ineffective assistance of counsel. Boateng's trial counsel also testified at the hearing and defended his trial tactics and strategy.

The motion judge concluded that trial counsel's conduct had not fallen below the standard of an ordinary fallible lawyer and denied Boateng's motion for a new trial. Boateng appealed from that denial, and we consolidated that appeal with his direct appeal. We consider first Boateng's claims of error at trial, and then his claim of ineffective assistance of counsel.

2. *Claims of Error at Trial.*

a. *Failure to hold a contemporaneous competency hearing.* Boateng's first claim of error is that the judge should have conducted a competency hearing on the day the trial was to start to ensure that he was competent to stand trial. Although a hearing had been conducted one week before trial, at which Boateng had been found competent, he claims that his long history of severe mental illness mandated a renewed hearing. While the judge is sometimes required to conduct a sua sponte inquiry into a defendant's competence, see *Commonwealth* v. *Hill*, 375 Mass. 50, 54 (1978), that requirement arises only if there exists a "substantial question of possible doubt" as to that competence. *Id.*, quoting *Rhay* v. *White*, 385 F.2d 883, 886 (9th Cir. 1967). On the first day of trial, trial counsel withdrew his previously filed motion for a competency hearing as moot, and informed the judge that nothing had occurred within the past week to warrant a new inquiry. In these circumstances there was no substantial question that required the judge's sua sponte action.[2]

b. *Failure to conduct a hearing on voluntariness.* Boateng claims that the judge erred in failing to hold a hearing and make a determination whether his statements on the day of the murder, including his statements to Moore, Moore's mother,

---

[2]Boateng's claim of ineffective assistance rests in part on trial counsel's failure to request a new hearing, and we consider that claim *infra.*

and the police, were voluntary. He points out that a judge is required, sua sponte, to conduct a hearing regarding the voluntariness of statements made by a defendant when voluntariness is at issue, see, e.g., *Commonwealth* v. *Crawford*, 429 Mass. 60, 65 (1999), and that a defense of insanity, by raising questions about the defendant's state of mind, always makes voluntariness an issue in the case. See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 99 (1982), quoting *Commonwealth* v. *Chung*, 378 Mass. 451, 457 (1979) ("if the defendant comes forward with evidence of insanity at the time of his [statements], the judge is obliged initially to determine whether the statements were the 'product of a rational intellect as part of the issue of voluntariness' ").

We first note that Boateng has offered no authority for the proposition that statements made to Moore and her mother during the extended assault on Moore and Jameel enjoy the benefit of a voluntariness analysis.[3] We similarly find no authority for such a conclusion. Voluntariness hearings are usually conducted to determine whether a defendant's statements to law enforcement officials after the fact are the "product of a rational intellect." *Commonwealth* v. *Vazquez, supra* at 99 (referring to statements "to law enforcement officers or their agents"). While the rule covers statements made by defendants to private parties in the aftermath of their criminal conduct, see, e.g., *Commonwealth* v. *Allen*, 395 Mass. 448, 455 (1985), we have never applied it to statements made by a defendant during the commission of his crime.[4] Boateng was not entitled to a voluntariness hearing with regard to statements made to Moore and her mother during the criminal episode.

---

[3]In some circumstances, with multiple and extended crimes alleged, it may be unclear when the "incident" ends and the postincident behavior begins. In the context of this case, however, we have no trouble deciding that Boateng's statements to Moore and her mother occurred during the commission of the crimes.

[4]We also note that several other States have likewise determined that courts must analyze a defendant's statements to private parties for voluntariness. See, e.g., *People* v. *Haydel*, 12 Cal. 3d 190, 197-198 (1974); *State* v. *Bowe*, 77 Haw. 51, 58-59 (1994); *State* v. *Bodtke*, 219 Neb. 504, 513 (1985); *People* v. *Pagan*, 211 A.D.2d 532, 533-534 (N.Y. 1995). None of those States, however, appears to have extended the rule to include statements contemporaneous with the criminal act. See, e.g., *People* v. *McCaskell*, 217 A.D.2d 527, 528 (N.Y. 1995) (defendant's statements to informant during criminal transaction "were part of the res gestae").

Boateng also claims that the judge should have conducted a hearing to determine the voluntariness of his statements to the police. These statements were made soon after the attacks. As we stated in *Commonwealth* v. *Vazquez, supra,* Boateng's defense of lack of criminal responsibility should have alerted the judge to his duty to conduct a voluntariness hearing before his statements to the police were used against him. It was error for the judge not to have conducted a hearing with regard to these statements. The question we must answer is whether this error requires reversal of the convictions.

Boateng's trial counsel did not request a voluntariness hearing, nor did he object to the failure to hold one.[5] Although an objection may be resurrected in a motion for a new trial if the motion judge considers the unobjected-to error on its merits, see *Commonwealth* v. *Hallet,* 427 Mass. 552, 553 (1998), the judge here confined his analysis to whether Boateng's trial counsel had been ineffective and, if so, whether a miscarriage of justice had resulted. In such circumstances, Boateng's underlying claim of unpreserved error at trial was not resurrected. Consequently, we review the error to determine whether there is a "substantial likelihood" that a miscarriage of justice has resulted. See *Commonwealth* v. *Graham,* 431 Mass. 282, 286-287, cert. denied, 531 U.S. 1020 (2000).

We conclude that the failure of the trial judge to conduct a voluntariness hearing did not create a substantial likelihood of a miscarriage of justice. First, the testimony of the police as to their observations of Boateng's calm demeanor and actions after the assaults would have been admissible and probative on the question of sanity even if the specific statements made to them by Boateng had been excluded. Second, Boateng's calm demeanor and lucid conversation suggest that any hearing on the issue of voluntariness would likely have resulted in the conclusion that Boateng's statements to the police were voluntary. Third, the statements, although in part corroborative

[5]The motion judge who heard the testimony of trial counsel as to why he had not requested a voluntariness hearing concluded that the failure to make the request was reasonable both because it was unlikely to succeed, and because some aspects of Boateng's statements were important to the insanity defense.

of sanity, were not central to the case, which turned largely on Moore's description of Boateng's attacks and the testimony of the experts regarding Boateng's mental illness. Finally, the judge, pursuant to our "humane practice," e.g., *Commonwealth v. Serino*, 436 Mass. 408, 413 (2002), instructed the jury that they were to independently determine whether Boateng's statements were voluntary before considering them as evidence of guilt, thus mitigating any possible harm resulting from the judge's failure to hold a voluntariness hearing.[6] In sum, there was no substantial likelihood of a miscarriage of justice.

c. *Failure to preserve exculpatory evidence.* Sometime during the incident, Boateng allegedly vomited in the bathroom, apparently soon after drinking from the container of bleach. He also left some blood in the bathroom. The police did not recover samples of either the vomit or the blood. Boateng alleges that this failure was official misconduct that prevented him from presenting an effective defense, because an analysis of his blood and vomit would have shown that he had ingested massive quantities of his antidepressant and antipsychotic medications before attacking Jameel.[7] We reject this claim because the prosecution "is under no duty to gather evidence that may be potentially helpful to the defense." *Commonwealth v. Lapage*, 435 Mass. 480, 488 (2001).

Boateng further argues that, in these circumstances, the trial judge should have given the jury a so-called *Bowden* instruc-

---

[6] In his humane practice instruction, the judge did not specifically instruct the jury that they had to find Boateng's statements voluntary "beyond a reasonable doubt" before they could consider them. While it is highly preferable that the burden of beyond a reasonable doubt be specifically referenced in the humane practice instruction, the failure to do so does not render it inadequate where, as here, the judge's charge fully and repeatedly informed the jury that the burden was on the prosecution to prove the case and all of its elements beyond a reasonable doubt. *Commonwealth v. Doucette*, 391 Mass. 443, 456-457 (1984). *Commonwealth v. Laurore*, 437 Mass. 65, 81 (2002).

[7] While such an analysis conceivably could have served to corroborate Boateng's claim that he had ingested an overdose of his medications, he has not presented any expert opinion suggesting that that analysis could confirm precisely when he had ingested them. Whether he took them during the assaults, as he claimed to Dr. Rosemarin, would not necessarily be corroborated by the samples. Nor did he present any opinion as to how rapidly the claimed overdose would have adversely affected his mental state. Thus, the usefulness of such evidence is questionable.

tion, see *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980), informing them that they could consider the failure of the police to collect possibly exculpatory evidence in determining whether reasonable doubt existed as to the defendant's guilt. As we have stated many times, however, a judge is not required to instruct on the claimed inadequacy of a police investigation. "*Bowden* simply holds that a judge may not remove the issue from the jury's consideration." *Commonwealth* v. *O'Brien*, 432 Mass. 578, 590 (2000). The judge did not preclude the jury from considering the alleged inadequacy of the police investigation here, and there was no error in the failure to give a *Bowden* instruction.

d. *Admission of autopsy photographs.* Boateng next argues that the introduction of numerous autopsy photographs of Jameel's body was unduly inflammatory and prejudicial. The Commonwealth initially offered in evidence a large number of photographs during the testimony of the medical examiner who conducted the autopsy. The judge pared down the number, and those photographs that were admitted, although graphic, had important probative value on the issue whether the killing had been committed with extreme atrocity or cruelty. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 803 (2002) (photographs of victim taken at crime scene and during autopsy relevant to show extreme atrocity or cruelty).

Boateng, citing our holding in *Commonwealth* v. *Bastarache*, 382 Mass. 86 (1980), argues that a photograph of Jameel's head, taken after the scalp had been removed, was improperly admitted because in many cases "the actual viewing of a photograph showing the body as altered in the course of an autopsy would serve no proper purpose." *Id.* at 106. As we also noted, however, decisions regarding the admittance of autopsy photographs are left "almost entirely to the discretion of the trial judge." *Id.* The judge's decision to admit a single post-autopsy photograph in this case was not an abuse of discretion, but instead a reasonable attempt to allow the Commonwealth to convey the brutality of the crime in a visually efficient manner.

e. *Failure to enter required finding on murder in the first degree.* At the close of the evidence, trial counsel moved for a required finding of not guilty on the charge of murder in the first degree. He argued that the evidence was insufficient to

prove that Boateng had the mental capacity to commit the act of murder with extreme atrocity or cruelty. The motion was properly denied.

In *Commonwealth* v. *Chaleumphong*, 434 Mass. 70, 79-80 (2001), we held that while a jury may consider a defendant's diminished mental capacity in determining whether a murder was committed with extreme atrocity or cruelty, actual knowledge by the defendant of the atrocity or cruelty of the murderous act is not a necessary condition for a conviction under that theory. In this case, there was sufficient evidence for the jury to find that despite Boateng's mental illness he had committed murder with extreme atrocity or cruelty. There was no error.

f. *Consciousness of guilt instruction.* Boateng contends that the judge should not have included in his jury charge an instruction on consciousness of guilt. The Commonwealth's expert, Dr. Whaley, based his conclusion that Boateng was sane largely on his goal-directed actions, such as ripping the telephone out of the wall after speaking with Moore's mother. Boateng argues that the judge's consciousness of guilt instruction essentially told the jury to base their decision on the same factors relied on by Dr. Whaley, impermissibly bolstering Dr. Whaley's testimony and leading the jury to agree with his conclusion that Boateng was sane.

We disagree. Our holding in *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 436-437 & n.9 (2001), establishes that the jury may consider evidence of consciousness of guilt when determining whether a defendant had the mental capacity to be criminally responsible for an act. The judge's instruction regarding consciousness of guilt did not impermissibly bolster Dr. Whaley's testimony. Rather, it informed the jury that if they agreed with Dr. Whaley that Boateng's actions subsequent to the attacks suggested a guilty mind, they could use that consciousness of guilt evidence as part of their analysis. There was no error.

3. *Ineffective Assistance of Trial Counsel.*

Appealing from the denial of his motion for a new trial, Boateng makes several claims regarding the ineffectiveness of his trial counsel's performance. We again consider each in turn. We apply the "substantial likelihood of a miscarriage of justice"

standard of review to these claims, considering "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). In doing so, however, we keep in mind that many of the alleged errors were tactical or strategic decisions on the part of trial counsel, which "may appear questionable from the vantage point of hindsight," but "do not amount to ineffective assistance unless 'manifestly unreasonable' when undertaken." *Commonwealth* v. *Johnson*, 435 Mass. 113, 133-134 (2001), quoting *Commonwealth* v. *Haley*, 413 Mass. 770, 777-778 (1992).

a. *Dual representation.* Before trial, defense counsel informed the judge that he represented a prosecution witness, the medical examiner, in an unrelated civil case to which the medical examiner was a party. He stated that he had discussed the matter with the medical examiner, the prosecutor, and Boateng and that all believed that his representation in the civil case did not create a conflict of interest. Boateng now contends, however, both that the judge failed to conduct a proper colloquy with him to ensure his knowledge of and voluntary assent to the dual representation, and that trial counsel's dual representation in fact prejudiced him because it caused counsel to refrain from aggressive cross-examination of the medical examiner and from calling a rebuttal witness who could have provided a different opinion regarding the cause of death, an opinion more favorable to Boateng. The judge who ruled on Boateng's motion for a new trial rejected both of these claims, and we do as well.

On learning of the dual representation, the trial judge conducted an inquiry of Boateng to determine whether his decision to continue with his trial counsel was intelligently made. The judge asked Boateng several questions in regard to the potential conflict,[8] and received assurances that he found to be informed and adequate. While the colloquy, which is largely set

[8]To the judge's statement that "[counsel] says that he talked to you about that a couple of times," Boateng responded, "Yes, Your Honor." The judge then stated that while counsel's dual representation created a conflict "in a technical sense," the judge understood that Boateng had no objection to counsel's continued representation, including a cross-examination of the medical examiner. Boateng again replied, "Yes, Your Honor." Although initially

forth in the margin, did not elicit the type of narrative responses from Boateng for which we expressed a preference in *Commonwealth* v. *Goldman*, 395 Mass. 495, 507-508, cert. denied, 474 U.S. 906 (1985), and was less extensive than the model we approved in *Commonwealth* v. *Jones*, 403 Mass. 279, 281-284 n.2 (1988), this does not mean that it was inadequate. We are satisfied that any deficiency in the colloquy as it appears in the transcript was due less to the diligence of the judge in ensuring that the decision was knowing and voluntary than to the reticence of the defendant. Boateng knowingly and voluntarily assented to the dual representation.

Boateng is similarly incorrect in his claim that the dual representation itself warrants a reversal of his convictions. The motion judge found that trial counsel's conflict of interest was only potential, not actual. We agree. While Boateng cites *Commonwealth* v. *Hodge*, 386 Mass. 165 (1982), for the proposition that simultaneous representation always creates an actual conflict, the nature of the conflict in this case is significantly different from that in the *Hodge* case. In that case, the witness represented by defense counsel's firm was a key witness against the defendant on a "critical issue" in the case, providing testimony so contrary to the defendant's story that before the witness was cross-examined the defendant gave evidence to his attorney showing that the witness was wrong and asked the attorney to present the evidence to the court, which the attorney refused to do. *Id.* at 166-167. While Boateng asserts that similar circumstances are present here, and that trial counsel's representation of the medical examiner prevented him from presenting important evidence on Boateng's behalf, we disagree that the circumstances are similar and that the evidence to which Boateng now points would have assisted him.

In essence, Boateng now asserts that the killing of Jameel

satisfied, the judge again addressed Boateng, explaining how his counsel might find himself in the uncomfortable position of having to vigorously cross-examine his own client if the medical examiner gave unexpected testimony. He reiterated to Boateng that "you have to accept with that the fact that it's conceivable something could happen while [the medical examiner] was testifying that made his . . . and your position, somewhat antagonistic. Do you understand that?" Boateng again stated, "Yes, Your honor." The judge asked twice more. Both times the defendant replied, "Yes, Your Honor."

could not have been extremely atrocious or cruel because there is evidence to suggest that Jameel died as a result of the first blow administered by his throwing Jameel to the floor. At the evidentiary hearing on the motion for a new trial, Boateng called an expert who adopted that theory, claiming that the first blow struck Jameel's head against the floor, killing him. Boateng claims that trial counsel should have presented this evidence and argued that when a single blow causes death the killing cannot be considered extremely atrocious or cruel as a matter of law. That argument, however, would have stood in direct conflict with the law as elaborated in *Commonwealth* v. *Golston*, 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978) ("A murder may be committed with extreme atrocity or cruelty even though death results from a single blow"). See *Commonwealth* v. *O'Brien*, 432 Mass. 578, 591 (2000) (judge's "instruction that death caused by a single blow could, in some circumstances, as when directed against an infant, support a finding of extreme atrocity or cruelty, was correct").[9]

Moreover, in determining whether the murder was committed with extreme atrocity or cruelty, the jury must consider the *Cunneen* factors, including, among others, the defendant's indifference to the victim's suffering; the extent of the injuries; the manner and force with which the wounds occurred; and the disproportion between the force used by the defendant and the means necessary to cause death. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). Although the jury must find at least one of these factors to support their verdict, there is no one factor that is an essential element of extreme atrocity or cruelty, and the jurors do not have to be unanimous as to which factor is found. *Commonwealth* v. *Hunter*, 427 Mass. 651, 657-658 (1998). The jury heard evidence that Boateng beat a five-week old baby so severely that he crushed his skull, broke several of his ribs, and seriously damaged his lungs. Thus, even if death resulted from the first blow, the jury had ample evidence from which to conclude that one or more of the *Cunneen* factors were present and that the case presented an occasion of

---

[9]The judge in fact instructed the jurors that "[a] murder may also be committed with extreme atrocity or cruelty, even though death results from a single blow."

"savage, unfeeling, [and] long-continued brutality." *Commonwealth* v. *Cunneen, supra* at 228. Boateng was not prejudiced by his trial counsel's failure to present an alternative "single blow" theory to rebut the conclusions of the medical examiner.

Finally, the medical examiner's testimony regarding cause of death was peripheral to Boateng's defense of insanity, and indeed, as trial counsel testified at the hearing on the motion for a new trial, there were many aspects of the medical examiner's testimony, presumably including the ghastliness of the killing, that supported the defense theory of insanity.

There are other important differences between the situation addressed in *Commonwealth* v. *Hodge, supra,* and the case before us. For example, in the *Hodge* case, while there was evidence that defense counsel had notified the defendant that a law partner was representing a key prosecution witness against him in a civil matter, there was no evidence that defense counsel fully explained the implications of this representation to the defendant or that defense counsel informed the court of the potential conflict. Consequently, the judge was not even in a position to conduct his own inquiry. In light of these circumstances, the court reasoned that the defendant had not waived his right to a lawyer with undivided loyalties because he had not "understood and appreciated" the possible harm the conflict might cause him. *Id.* at 170. In contrast, here the potential conflict was brought to the judge's attention in a timely fashion, and the judge conducted a colloquy with Boateng, specifically directing his attention to the possible negative implications of the dual representation. He concluded that Boateng's waiver of the potential conflict was knowing and intelligent. In these circumstances, Boateng was not deprived of any rights that he may have had.

b. *Failure to request a contemporaneous competency hearing.* Boateng next argues that his counsel's failure to request a competency hearing on the day trial began constituted ineffective assistance. As noted earlier, trial counsel moved for a competency hearing, which took place one week before trial and resulted in a determination that Boateng was competent. Boateng has presented no evidence whatsoever to contradict

trial counsel's statement to the court on the first day of trial that Boateng's condition had not changed in the intervening week. There were no grounds on which to request a new hearing, and trial counsel's decision not to request one was not error.

c. *Failure to present additional medical experts.* At the hearing on his motion for a new trial, Boateng presented the testimony of three medical experts in an effort to show that trial counsel's presentation of the insanity defense could have been more comprehensive and that the defense at trial was so deficient as to amount to ineffective assistance of counsel.

The first new expert, Dr. Allen Brown, testified that at the time of the attacks, Boateng was suffering from a schizoaffective disorder. This was the same diagnosis offered at trial by Dr. Rosemarin, except that Dr. Brown also applied this diagnosis to conclude that Boateng was not capable of intelligently waiving his Miranda rights and giving voluntary statements to the police. The second new expert, Dr. Paul Spiers, a neuropsychologist, testified to a different diagnosis of Boateng's condition. Specifically, it was his opinion that Boateng had been exposed to the Epstein-Barr virus while visiting England and that this exposure caused encephalitis and seizures. Spiers believed that Boateng was suffering from one of these seizures on the day of the attacks, though he stated that Boateng was actively psychotic at the time as well. He concluded that Boateng was not criminally responsible with regard to the attacks on both Moore and Jameel. The third new expert, Dr. Ira Kanfer, a forensic pathologist, testified that the evidence regarding Jameel's death was most consistent with his having died after the first blow he received — Boateng's throwing him to the floor.

Any added benefit that these experts could have provided, however, is not sufficiently great or certain as to render trial counsel's presentation of the insanity defense ineffective or likely to have influenced the jury's conclusion. First, as we have already discussed, the "single blow" hypothesis regarding Jameel's cause of death would not have undermined the Commonwealth's theory of murder in the first degree based on extreme atrocity or cruelty. Second, Dr. Whaley, the Commonwealth's expert, and Dr. Rosemarin, the defense expert,

generally agreed in their diagnoses of the defendant's illness.[10] The medical records were also consistent with the experts who testified at trial. Dr. Spiers, on the other hand, approached Boateng's illness from a completely different angle, the angle of a neuropsychologist rather than that of a psychiatrist. A diagnosis of Epstein-Barr virus and seizures could certainly have confused a jury that had, until that point, heard fairly consistent testimony that Boateng suffered from a different serious mental condition. Trial counsel, who had consulted with Dr. Spiers prior to trial, elected not to call him in an effort to avoid this confusion. This decision was not a manifestly unreasonable tactical decision on trial counsel's part. See *Commonwealth* v. *Laurore*, 437 Mass. 65, 76-77 (2002) (trial counsel who presents one expert medical witness not ineffective for refusing to call other expert whose conclusions were inconsistent and more speculative). Also, while Dr. Spiers's testimony might have provided Boateng with a more complete defense in the sense that he was of the opinion that Boateng was not criminally responsible for either of the attacks on Jameel or Moore, it is unlikely that the jury, who rejected Boateng's insanity as a defense to the murder of Jameel, would have accepted it regarding the assault on Moore that occurred just before.[11]

Finally, as we have already stated, it is unlikely that Boateng's statements to the police would have been found involuntary or, even if they had been suppressed, that their suppression would have affected the outcome of the trial. Dr. Brown's testimony would therefore have been largely duplicative of Dr. Rosemarin's. None of these three experts would have provided

---

[10]This diagnosis is also consistent with the diagnosis testified to by Dr. Brown at the hearing on the motion for a new trial.

[11]Boateng asserts that counsel's failure to call any witness who could provide an expert conclusion regarding his state of mind when he attacked Moore constituted an abandonment of the defense for the charges relating to Moore. Dr. Rosemarin did testify, however, that Boateng's mental illness contributed to his attack on Moore. Furthermore, evidence that Boateng, suffering from a long-term mental illness, was insane at the time he attacked Jameel necessarily raised some question as to his sanity when he attacked Moore. Trial counsel's case sufficiently called into question Boateng's state of mind during the entire incident to constitute a defense to the charges relating to Moore.

Boateng a sufficiently better defense to render that provided by trial counsel constitutionally ineffective.

d. *Jury instructions.* Boateng argues that trial counsel was ineffective for failing to object to several allegedly erroneous jury instructions. We consider whether the jury instructions in question were erroneous and, if so, whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth v. Cruz*, 430 Mass. 182, 196 (1999), quoting *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992).

i. *Malice aforethought.* Boateng claims that the judge's instruction on malice aforethought was error. In the context of murder in the first degree by means of extreme atrocity or cruelty, this court has defined malice as (1) an unexcused, specific intent to kill; (2) an unexcused, specific intent to inflict grievous bodily harm; or (3) an unexcused intent to commit an act that, in the circumstances known to the defendant, would lead a reasonably prudent person to know that there was a plain and strong likelihood that death would result from the act. See *Commonwealth v. Vizcarrondo*, 427 Mass. 392, 394-395 n.3 (1998), *S.C.*, 431 Mass. 360 (2000). In his instructions, the trial judge did not distinguish between the specific intent requirement of the first two prongs of this definition and the general intent requirement of the third. The instructions also omitted the "reasonably prudent person" language from the third prong, and, Boateng alleges, did not inform the jury that they could consider his mental impairment in reaching a conclusion on malice. There was no error.

A trial judge's decision not to use the words "specific" and "general" to distinguish the different forms of intent that comprise malice is not fatal to a jury instruction. As this court stated in *Commonwealth v. Gunter*, 427 Mass. 259, 268-269 (1998), "[w]e do not think it necessary that a judge use the common-law terms, general intent and specific intent, provided that he explains to the jury the Commonwealth's burden on the specific intent element in a charged offense . . . ." See *Commonwealth v. Sires*, 413 Mass. 292, 301 n.8 (1992) ("We see no need for a judge to refer to the defendant's *specific* intent to do something as an element of a crime. A reference to intent is sufficient" [emphasis in original]). The judge's instructions here

sufficiently explained the Commonwealth's burden in proving malice. There was no error.

Likewise, the removal of the "reasonably prudent person" clause from the description of the third prong of malice is not erroneous if the resulting instruction still conveys the definition. Here, in fact, the definition conveyed was, if anything, more favorable to Boateng. We have stated that the third prong of malice contains an objective and a subjective component. See, e.g., *Commonwealth* v. *Mello*, 420 Mass. 375, 389-390 (1995). The objective component is the "reasonably prudent person" language. *Id.* at 390. If this clause is removed, then the third prong of malice becomes more subjective, suggesting to the jury that it may be the defendant's understanding of an action's consequences, rather than the understanding of a reasonably prudent person, that governs. Therefore, while an omission of the "reasonably prudent person" clause might misstate the third prong of malice, it cannot do so to the harm of the defendant, and he cannot complain of it as error.

Finally, Boateng is incorrect to state that the judge did not inform the jury that they could consider his mental state when determining malice. Immediately following the instruction defining malice, the judge stated that the jury "may consider the evidence of the defendant's mental impairment . . . in determining whether the defendant had the capacity to form" a malicious intent. Consequently, the jury were properly informed of their right to consider Boateng's mental state on the subject of malice. There was no error.

ii. *Involuntary manslaughter.* Boateng asserts that the judge's instruction defining involuntary manslaughter was also incorrect because the jury were not told that they could consider Boateng's mental incapacity in deciding whether he could form the intent to commit the battery underlying involuntary manslaughter. While it is correct that the judge did not include in his manslaughter instruction a reprise of his earlier statement that the jury could consider the defendant's mental impairment in coming to their conclusion, the instructions as a whole conveyed to the jury that they could consider such impairment. Even if the instructions were insufficient in that regard, they did not create a substantial likelihood of a miscarriage of justice, as

Boateng was convicted of murder, not manslaughter. See *Commonwealth* v. *Coleman*, 366 Mass. 705, 712 (1975) (unclear how defendant convicted of murder in the second degree could have been "harmed in a practical way" by erroneous instruction on involuntary manslaughter).

iii. *Assault with intent to murder.* In instructing the jury on the separate charge that Boateng assaulted Moore with the intent to murder her, the judge stated that one element of that crime was "malice, as I have previously defined that for you," referring to the three prongs of malice used in the definition of murder. We have held, however, that in the context of assault with intent to murder, malice has a different definition: the "absence of justification, excuse, [or] mitigation." *Commonwealth* v. *Nardone*, 406 Mass. 123, 130 (1989), quoting *Commonwealth* v. *Henson*, 394 Mass. 584, 589 (1985). That definition should be included in the jury instruction on assault with intent to murder. See *Commonwealth* v. *Gladney*, 34 Mass. App. Ct. 151, 159 (1993). Therefore, the judge's instruction on assault with intent to murder was erroneous. We need only further decide whether that error created a substantial risk of a miscarriage of justice.

The judge's erroneous instruction could only have created a substantial risk of a miscarriage of justice if the jury, properly instructed, could have concluded that Boateng's mental illness constituted a "justification, excuse, [or] mitigation" sufficient to preclude a finding of malice. In the context of this definition of malice, "justification" and "excuse" simply mean factors that make a killing lawful. *Commonwealth* v. *Nardone*, *supra* at 130-131. "Mitigation," however, embodies a broader category of circumstances in which "the killing arose from the frailty of human nature, as in instances of sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense." *Id.* We have not previously held whether frailty due to mental illness can be a mitigating factor that would vitiate malice and reduce an assault with intent to murder to an assault with intent to kill. But we think that common sense suggests that it can be.

As the judge instructed the jury in this case, a defendant's mental impairment can be taken into account in deciding

whether the defendant possesses the requisite malice for murder. See *Commonwealth* v. *Sleeper*, 435 Mass. 581, 597 (2002). Mental incapacity can also prevent one from forming the malice requisite for attempted murder. See *Commonwealth* v. *Beattie*, 409 Mass. 458, 459 (1991) (at trial for attempted murder jury may consider evidence of defendant's alcohol or drug impairment in concluding whether defendant could form specific intent to murder). The definition of malice in the context of attempted murder is the same as the definition in the context of assault with intent to murder. See *Commonwealth* v. *Murray*, 51 Mass. App. Ct. 57, 63 n.11 (2001) (malice "means only that [the defendant] intended to kill the victims and that such an intent to kill was unlawful, unexcused, without justification and without any mitigation"). If mental incapacity can vitiate malice in the attempted murder context, then, it must also be able to vitiate it in the assault with intent to murder context. Therefore, the jury could properly have found that Boateng's mental illness constituted a "mitigation" that reduced his crime to assault with intent to kill. The judge's failure so to instruct the jury created a substantial likelihood that Boateng was convicted of a crime of which he might have been acquitted had the proper instruction been given. As a result, we reverse the conviction of assault with intent to murder.

4. *G. L. c. 278, § 33E, review.* A review of the complete record of the proceedings pursuant to our responsibility under G. L. c. 278, § 33E, reveals that Boateng was well represented by counsel, and that the case was fairly tried. We find no basis on which to grant relief on the murder conviction.

5. *Conclusion.* The judgments on the charges of murder in the first degree, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and assault and battery are therefore affirmed. The order denying the defendant's motion for a new trial is affirmed as to these convictions. With respect to the charge of armed assault with intent to murder, the order denying the defendant's motion for a new trial is reversed, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*