## Commonwealth vs. Rakeem Young.

No. 07-P-1461.

Suffolk. October 6, 2008. - January 8, 2009.

Present: Green, Smith, & Fecteau, JJ.

*Evidence,* Voluntariness of statement, Identification, Redirect examination, Explanation of previous testimony, Impeachment of credibility. *Identification. Witness,* Impeachment, Redirect examination, Explanation of previous testimony. *Practice, Criminal,* Voluntariness of statement, Conduct of government agents, Voir dire, Instructions to jury, Public trial, Jury and jurors. *Constitutional Law,* Public trial. *Jury and Jurors.*

At a criminal trial, the judge did not err in admitting in evidence statements that the defendant made to a third party while the two were temporarily being held together in a jail cell, where the third party was not a government agent at the time the defendant made the statements, and even if he were, there was no evidence that the Commonwealth intentionally had him placed in the cell with the defendant; moreover, the statements of the defendant indicated that they were not the product of any questioning or interrogation by the third party. [481-483]

At the trial of indictments charging the defendant with murder and armed assault with intent to murder, the judge did not err in admitting in evidence for substantive purposes testimony concerning a witness's out-of-court statement identifying the defendant as the assailant, where the witness testified at trial and was subject to cross-examination concerning his statement [483-484]; likewise, the judge did not err in permitting the witness to explain, on redirect examination, why he had recanted his identification of the defendant as his assailant, where the defense had elicited on cross-examination testimony about the recantation, and the Commonwealth was therefore entitled to inquire about the reasons motivating the witness's inconsistent statements, and where the judge explicitly balanced the probative value of the testimony against any prejudice [484-485].

At a criminal trial, the judge's exchange with prospective jurors during voir dire did not amount to an instruction that a lack of scientific evidence was not to be considered in reaching a judgment, where a review of the exchanges revealed that the judge merely wanted an assurance that the jurors would not automatically vote to acquit due to lack of scientific evidence. [485]

The judge at a criminal trial did not abuse her discretion or infringe the defendant's right to a public trial by excluding the defendant's brother from the court room during a witness's testimony, where the witness was hesitant to testify and the brother's presence caused her apparent fear. [485-487]

The judge at a criminal trial did not abuse her discretion in dismissing,

without holding a hearing or finding an extreme hardship, a juror who had been seated but not sworn, where the juror's strong body odor was negatively affecting the other jurors; further, the defendant failed to demonstrate that the juror's dismissal affected the racial composition of the jury. [487-488]

INDICTMENTS found and returned in the Superior Court Department on September 30, 2004.

The cases were tried before *Nancy Staffier-Holtz*, J.

*Chrystal A. Murray* for the defendant.

*John P. Zanini*, Assistant District Attorney, for the Commonwealth, was present but did not argue.

SMITH, J. The defendant was the subject of three indictments charging him with (1) murder in the first degree; (2) armed assault with intent to murder; and (3) unlawful possession of a firearm. A jury returned a verdict of murder in the second degree, and verdicts of guilty as charged on the other two indictments. The defendant filed a timely appeal.

On appeal, the defendant claims that the judge committed error in (1) admitting statements obtained in violation of *Massiah v. United States*, 377 U.S. 201 (1964); (2) making certain evidentiary rulings; (3) instructing three prospective jurors during voir dire as to what evidence they could consider; (4) excluding the defendant's brother from the court room during one witness's testimony; and (5) dismissing a juror.

*Facts.* The jury reasonably could have found the following facts. During the evening of June 19, 2004, the defendant was assaulted near Orchard Park in the Roxbury section of Boston. He was taken by ambulance to Boston Medical Center, where he was treated for severe facial injuries and discharged later that evening. That same evening, Darrell Williams, with his friend, Cassim Weaver (the victim), picked up three female acquaintances, Sherry and Nicole McCullough and Bonnie Greene, in Williams's car. Williams was driving, Weaver was in the front passenger seat, and the three young women were in the back seat. They stopped at the Peking House, a Chinese restaurant near Orchard Park, and then drove to a parking lot nearby. While they were there, the defendant's brother, Chancellor Young, drove into the lot and parked his car in front of Williams's car. The defendant emerged from the back seat, walked over to the driver's side

window of Williams's car and asked, "Which one of you all jumped me?" Shortly thereafter, the defendant fired several shots into the car, fatally injuring Weaver, and injuring Williams. The defendant fled in the vehicle driven by his brother. Approximately six months later, on February 1, 2005, Williams shot and killed another brother of the defendant, Terrence Young.

1. *Violation of the defendant's* Massiah *rights.* On appeal, the defendant claims that the judge committed error in allowing Williams to testify to certain statements the defendant allegedly made to Williams while the two were temporarily being held together in a cell, waiting to be transferred to court. The defendant claims that the statements were admitted in violation of *Massiah* v. *United States, supra,* because Williams was a government agent.

"Under the Sixth Amendment [to the United States Constitution], the Commonwealth may not 'deliberately elicit' statements from the defendant in the absence of his counsel, once formal adversary proceedings have commenced."[1] *Commonwealth* v. *Reynolds,* 429 Mass. 388, 393 (1999), citing *Massiah* v. *United States, supra* at 206. "Any evidence deliberately elicited in violation of that rule must be suppressed." *Commonwealth* v. *Reynolds, supra.* "This prohibition applies equally to overt interrogation by police officers and informants acting as government agents." *Ibid.* "A judge must determine whether a witness was an agent of the government and, if so, whether evidence was 'deliberately elicited' after the agency relationship was formed." *Ibid.*

We recite the undisputed facts relevant to our resolution of the defendant's claim. Following the murder of the defendant's brother (Terrence), Williams, on May 9, 2006, signed an agreement stating that the Commonwealth would allow Williams to plead guilty to murder in the second degree in exchange for Williams's "complete and truthful" testimony in the defendant's case.[2] On May 19, 2006, Williams was brought to court to plead

---

[1]Here, the defendant was indicted in September, 2004. Thus, his Sixth Amendment right to counsel had attached at the time he allegedly made the statements to Williams on June 21, 2006. See *Commonwealth* v. *Torres,* 442 Mass. 554, 570 (2004).

[2]The agreement contains the following language:

"Mr. Williams agrees to provide complete and truthful information to

guilty to murder in the second degree in regard to the killing of Terrence. Williams, however, changed his mind and refused to plead guilty because he believed that he did not receive a good enough deal.

On June 21, 2006, the day before the defendant's trial was to begin, the prosecutor had Williams brought to court in order to learn whether Williams was to be a witness in the defendant's trial. The same day, the defendant was also to be brought to court. Williams and the defendant were placed in the same temporary holding cell awaiting transportation to the court house. While there, the defendant told Williams that (1) if Williams did not testify against him, he would make sure that a witness in Williams's case would not testify against Williams; (2) he knew the mother of Williams's child and the mother of Williams's brother's child; and (3) he followed Williams on the night of the incident and knew he was at the Peking House. The defendant also told Williams that he (the defendant) had been beaten earlier in the evening and that the persons who beat him "hung" with Williams. After the conversation, Williams was brought into the court room, where he refused to testify against the defendant, invoking his privilege under the Fifth Amendment to the United States Constitution.

The second day of trial, the prosecutor told defense counsel that Williams had changed his mind and would testify. The defendant filed a motion to exclude Williams's testimony as to the statements the defendant had allegedly made to Williams while they were in the holding cell. Without holding a voir dire, the trial judge denied the motion after argument by counsel. The defendant renewed his objection during Williams's testimony, and the trial judge overruled it. The judge found that the statements were inculpatory and showed consciousness of guilt, that they were

law enforcement officials investigating and prosecuting the murder of Cassim Weaver and the related non-fatal shooting of Mr. Williams. Mr. Williams agrees to make himself available for and to testify completely and truthfully at any hearings or trials relating to the murder of Cassim Weaver and the non-fatal shooting of Mr. Williams. . . . This agreement is contingent upon the truthfulness of the information and testimony that Mr. Williams has provided and will continue to provide to law enforcement officials regarding the June 20, 2004 homicide of Cassim Weaver and the non-fatal shooting of Mr. Williams."

admissible because Williams did not deliberately elicit the statements, and that the placement of Williams into the same holding cell as the defendant was accidental.

We begin by considering whether the agreement between Williams and the Commonwealth was in effect at the time the defendant made his statements to Williams. The undisputed facts demonstrate that after Williams entered into the agreement with the Commonwealth on May 9, 2006, he repudiated the agreement on May 19, 2006, when he refused to plead guilty to second degree murder, the "benefit" he had been promised if he provided "complete and truthful information to law enforcement officials investigating and prosecuting the murder of Cassim Weaver" (see note 2, *supra*).

On June 21, 2006, the date the defendant made the contested statements to Williams in the holding cell, Williams refused to testify against the defendant. Not until five days later did Williams change his mind and notify the prosecutor that he would testify. Therefore, Williams was not an agent of the Commonwealth at the time the defendant made the statements.

Further, even if we assume that Williams was an agent of the Commonwealth at the time the defendant made the statements, there was no evidence that the Commonwealth intentionally had Williams placed in the holding cell with the defendant.

Finally, the statements of the defendant indicate that they were not the product of any questioning or interrogation by Williams. Rather, the statements were volunteered by the defendant in order to make a deal, i.e., if Williams agreed not to testify against the defendant in his trial, the defendant would help Williams in his trial. Volunteered statements do not implicate the Sixth Amendment. *Commonwealth* v. *Hilton*, 443 Mass. 597, 618 (2005), *S.C.*, 450 Mass. 173 (2007).

2. *Evidentiary claims.* The defendant next claims that the trial judge improperly admitted testimony concerning Williams's identification of the defendant at the hospital following the shooting. The defendant also claims that the judge improperly admitted testimony explaining prior inconsistent statements Williams made while he was incarcerated. Because the statements were admitted over defense objection, we review for prejudicial error. See *Com-*

*monwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). We address each evidentiary claim in turn.

a. *Identification testimony.* The defendant asserts that Williams's out-of-court statement that the defendant shot him was not admissible as a prior consistent statement or as indicative of a state of police knowledge. The Commonwealth maintains that Williams's statement is admissible for substantive purposes. We agree with the Commonwealth. See Mass.G.Evid. § 801(d)(1)(C) (2008-2009) ("A statement of identification made after perceiving the person if the declarant testifies at trial . . . and is subject to cross-examination concerning the statement" is not hearsay and is admissible for the truth of the matter asserted). See also *Commonwealth v. Cong Duc Le*, 444 Mass. 431, 439-440 & n.8 (2005); *Commonwealth* v. *Raedy*, 68 Mass. App. Ct. 440, 447-450 & n.14 (2007).

b. *Rehabilitation of Williams following impeachment by prior inconsistent statements.* On cross-examination, the defense elicited testimony from Williams that he wrote two letters to the defendant, while they were both incarcerated, in which he recanted his earlier identification of the defendant as his assailant. The two letters were admitted in evidence. On redirect examination, Williams explained that he recanted his earlier identification because he did not want to be perceived by his fellow inmates as "ratting" on the defendant. The defendant claims that the trial judge's admission of Williams's explanation was improper because Williams's motivation to write the letter was not relevant to the defendant's guilt and was more prejudicial than probative. We are not persuaded.

"When a witness has been impeached, the party who called the witness may introduce evidence that explains or contradicts the impeachment evidence." *Commonwealth* v. *Cintron*, 435 Mass. 509, 521 (2001). Here, the Commonwealth was entitled to inquire about the reasons motivating Williams's inconsistent statements. Williams's explanation also was relevant to the question of the defendant's guilt and to Williams's credibility as a witness. The trial judge also explicitly balanced the probative value of the testimony against any prejudice, and found that any prejudice was not at such a level that the testimony had to be excluded. Essentially, the judge concluded that there would be

little prejudice resulting from the jury's knowledge that the defendant spent time in prison, as they already knew that he had been arrested for murder in the first degree. She reminded the jurors that there was no evidence suggesting the defendant was connected to any threats of assault on Williams made by other inmates. The admission of the rehabilitation testimony was not an abuse of the judge's discretion and, therefore, was not error.

3. *Instruction to prospective jurors.* The defendant next claims that the judge improperly instructed three jurors during voir dire. He specifically objects to the judge's instruction following the jurors' response to the question, "[I]f the Commonwealth presented only testimony of witnesses, and presented no corroborating scientific evidence, would you automatically find the defendant not guilty, or would you make an independent assessment of the evidence?" The defendant asserts that the exchanges between the judge and the three jurors following that question led those jurors to believe that their determination whether a reasonable doubt existed was limited to the evidence presented during the trial. The defendant argues that the instructions were highly prejudicial because his defense theory relied upon a lack of an adequate police investigation.

The defendant correctly notes that a judge may not instruct jurors that a lack of scientific evidence is not to be considered in reaching a judgment. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485 (1980). Within the context of the voir dire here, however, the judge here did not give such an instruction. A review of the exchanges between the judge and the three jurors reveals that the judge merely wanted an assurance that the jurors would not *automatically vote to acquit* due to lack of scientific evidence. To that end, the judge reminded the jurors that the Commonwealth was not legally required to produce any particular kind of evidence to prove its case. Moreover, unlike in *Bowden*, the defendant here was not prevented from arguing his defense theory of lack of police investigation. The judge's instructions to the jurors during voir dire did not deprive the defendant of his right to a fair trial.

4. *Exclusion of the defendant's brother from the court room during Greene's testimony.* The defendant claims that his right to a public trial was infringed when the judge excluded the defendant's brother, Chancellor, from the court room during Greene's testimony. We disagree.

The Sixth Amendment requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." *Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969). "This right to a public trial is not, however, absolute and inflexible." *Commonwealth* v. *Stetson*, 384 Mass. 545, 550 (1981), quoting from *Commonwealth* v. *Bohmer*, 374 Mass. 368, 380 (1978). "A trial judge may exclude spectators in certain situations in order to 'ensure that the administration of the criminal law is fair and just.' " *Commonwealth* v. *Jones*, 71 Mass. App. Ct. 568, 571 (2008), quoting from *Commonwealth* v. *Stetson*, *supra*. See *Commonwealth* v. *Bohmer*, *supra* at 380-381 (judge may exclude spectators who intimidate witnesses or disrupt proceedings). See also *Commonwealth* v. *McCann*, 22 Mass. App. Ct. 953, 955 (1986) ("The limited exclusion [of a discharged codefendant after all evidence was taken] was within the trial judge's discretion to assure a fair trial, similar to that relating to the sequestration of witnesses"); *Commonwealth* v. *Jones*, *supra* (no abuse of discretion where the judge excluded the defendant's girlfriend from the hearing on the defendant's motion to suppress).

The defendant's brother's exclusion from the court room during Greene's testimony was not an abuse of the judge's discretion. The record reveals that Greene was hesitant to testify. In addition to her fear, the prosecution identified the defendant's brother as a "specific concern" for her. The judge also inquired of Greene, outside the presence of the jury, if there was anything that she particularly was concerned about, and Greene replied, "I know some of his family." Greene then acknowledged that "his family" referred to the defendant's family, including the defendant's brothers. Before Greene testified, the judge noted on the record at sidebar that she would allow the defendant's brother to be excluded from the court room during Greene's testimony.

As noted in *Commonwealth* v. *Bohmer*, *supra* at 380, "The judge must . . . have the power to maintain order in court proceedings so that the administration of the criminal law will be fair and just. . . . As a corollary to this power a judge has the authority to exclude spectators whose presence intimidates the witnesses." (Citations omitted.) The defendant in this case does not contend that any person other than his brother was excluded

from the court room. Further, the record reveals that Chancellor's presence caused apparent fearfulness on the part of Greene. We cannot say that the judge abused her discretion in ordering this limited exclusion.

5. *Dismissal of a juror.* The defendant claims that he was prejudiced when the judge erroneously dismissed a juror, who was seated but not sworn, because her strong body odor was negatively affecting the other jurors.

General Laws c. 234A, § 39, inserted by St. 1982, c. 298, § 1, provides in relevant part: "The court shall have the discretionary authority to dismiss a juror at any time in the best interests of justice. The court shall have authority to excuse and discharge an [e]mpanelled juror prior to jury deliberations after a hearing upon a finding of extreme hardship." The statute sets forth no additional guidelines or procedural prerequisites in the event of the trial judge's dismissal of a juror prior to deliberations, other than that such a dismissal must be based on "a finding of extreme hardship" or "in the best interests of justice." See *Commonwealth* v. *Jiminez,* 22 Mass. App. Ct. 286, 294 & n.8 (1986).

"In the absence of action or inaction which constitutes a denial of constitutional rights . . . or which constitutes an error of law, such as an abuse of discretion, we will not interfere with the trial judge in the jury selection process." *Commonwealth* v. *McKay,* 363 Mass. 220, 223 (1973). See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 794 (1977).

The defendant asserts that dismissal of the unsworn juror was not in the best interests of justice because there was no evidence that she could not carry out her responsibilities as a juror. The defendant also notes that the juror was of the same race as the defendant.

The judge first questioned the juror without challenges from either side. On the following day when jury selection resumed, the juror was missing from the pool. When the juror finally appeared, she was admonished by the judge for being tardy. The juror stated that she had had to submit a housing form due earlier that day. The judge told the juror that she had to have permission from the judge if she planned to be late.

Prior to the jury being given the oath, the judge dismissed the

juror and subsequently made the following findings on the record: "There was a juror seated in seat No. 10, juror 6-5, . . . who I'd made inquiry of earlier. And I just want the record to reflect, I guess, to be blunt, [the juror], for whatever reason, had some very bad, I guess to be blunt again, body odor, which was extremely strong, and I was able to detect in my lobby, as was the clerk, which is a personal matter for that potential juror, but for the fact that her personal problem was [of] such a magnitude that other jurors who had already been picked . . . either by act or words had indicated discomfort with that problem." The judge then addressed the defendant's objection to the juror's removal, stating, "[M]y concern is not her background, but rather that I have [sixteen] jurors who are able to function. And given the strength of the body odor, I'm satisfied that the other jurors would be put at a distinct disadvantage in their efforts to concentrate. So I note your objection, but she has been excused."

The defendant claims furthermore that the dismissal of the juror was improper because she was of the same race as the defendant, apparently arguing that the dismissal affected the racial composition of the jury. There is nothing in the record that shows the ethnic or racial composition of the jury. The record does show that the judge noted on the second day of empanelment that "we have a pretty decent pool here today, just even in terms of ethnic, racial mix." We note that after the jury were empanelled, the defendant did not make any challenge to the composition of the jury.

We hold that the judge's dismissal of the juror was not an abuse of her discretion. Here, the jury had not yet been sworn, and therefore, the judge had no duty to hold a hearing or find an extreme hardship. See G. L. c. 234A, § 39. The judge made sufficient findings on the record regarding her concern that the juror's body odor would affect the ability of the other jurors to concentrate. Accordingly, the defendant's claim fails.

*Judgments affirmed.*