COMMONWEALTH vs. RAMON PEREZ.

Essex. March 11, 2011. - September 23, 2011.

Present: IRELAND, C.J., SPINA, CORDY, & DUFFLY, JJ.

*Homicide. Intimidation of Witness. Witness,* Intimidation. *Practice, Criminal,* Capital case, Jury and jurors, Voir dire, Examination of jurors, Instructions to jury, Assistance of counsel. *Jury and Jurors. Evidence,* Scientific test, Opinion, Prior misconduct, Relevancy and materiality, Conversation between husband and wife, Prior inconsistent statement, Authentication.

At a criminal trial, the judge did not abuse his discretion by questioning members of the venire whether they believed the Commonwealth must present scientific evidence to prove its case beyond a reasonable doubt, where the questions were tailored to ensure that seated jurors were capable of deciding the case without bias and based on the evidence; where the questions did not suggest to potential jurors that a lack of scientific evidence could not be considered in determining whether a reasonable doubt existed as to the defendant's guilt; and where the questions did not commit the jury to a verdict in advance or have the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present. [688-691]

The judge at a criminal trial did not err in not instructing that the jury could consider the lack of police investigation and the lack of physical evidence in determining whether there was a reasonable doubt as to the defendant's guilt. [692]

Although the judge at a murder trial erred in permitting a witness to express during her testimony an opinion as to the defendant's culpability, no substantial likelihood of a miscarriage of justice arose, where strong circumstantial evidence of the defendant's guilt existed, where defense counsel previously had elicited testimony from that witness that she had signed a statement detailing that she had asked the defendant whether he had killed the victim, and where the Commonwealth in closing argument made no reference to the witness's opinion. [692-695]

At a murder trial, the judge did not abuse his discretion in admitting in evidence testimony from multiple witnesses that the defendant, in the days before and after the victim's death, was seen in possession of a handgun with characteristics similar to that of the murder weapon, where the testimony was relevant as a link in tending to prove that the defendant committed the crime, and was more probative than prejudicial. [695-696]

Although the judge at a murder trial erred in admitting in evidence one witness's testimony that, shortly before the murder, the witness and the defendant engaged in a protracted argument over the telephone regarding his visitation with their children, in that the testimony did not support an

inference that the defendant was enraged or provide support for the Commonwealth's theory that the murder was planned and executed coolly, the admission of the testimony did not unduly prejudice the defendant, where there existed strong circumstantial evidence of the defendant's guilt, and where the evidence was cumulative of other evidence admitted at trial regarding the defendant's relationship with the witness and his children [696-698]; further, the judge did not err in allowing that witness to testify about the telephone conversation, despite her having been married to the defendant at the time, where the conversation was not private and, therefore, the witness was not disqualified from testifying regarding the conversation [698].

At a murder trial, the judge did not err in admitting in evidence, as a prior inconsistent statement or inconsistent omission, an electronic journal kept by one witness that did not contain an entry regarding a visit from the defendant on the night of the murder (despite the witness's testimony at trial that the defendant had visited her that night), where testimony from a State trooper that the witness had given him a copy of pages from the journal sufficed to authenticate the journal and establish its chain of custody [698-699]; and where testimony from the witness provided a sufficient foundation for a jury to infer that the witness would have written about any face-to-face meeting with the defendant on the night of the murder [699-700]; further, although, pursuant to G. L. c. 233, § 23, the witness should have been told of the inconsistent omission and given an opportunity to explain it, no substantial likelihood of a miscarriage of justice to the defendant arose from the admission of the "omitted" journal entry, where the witness's trial testimony neither directly contradicted the Commonwealth's theory nor provided the defendant a complete alibi, and where the witness presumably was available to be recalled to the stand to explain the inconsistencies [700-702].

At a criminal trial, the evidence was sufficient to permit a rational jury to infer that a letter that the defendant wrote to a certain witness was intended to intimidate her so that she would alter her testimony. [702-704]

At a criminal trial, counsel was not ineffective for failing to object to a scientific evidence question asked during the venire voir dire, and there was no merit to a claim of ineffective assistance arising from counsel's argument on a motion for a required finding on a charge of witness intimidation; further, no substantial likelihood of a miscarriage of justice arose from counsel's failure to object to a witness's expression of an opinion regarding the defendant's culpability. [704]

INDICTMENTS found and returned in the Superior Court Department on October 23, 2002, and March 31, 2004.

The cases were tried before *Howard J. Whitehead*, J.

*Elaine Pourinski* for the defendant.

*David F. O'Sullivan*, Assistant District Attorney (*Gerald Shea*, Assistant District Attorney, with him) for the Commonwealth.

DUFFLY, J. A jury in the Superior Court convicted the defend-

ant of murder in the first degree in the shooting death of Henry Guzman, and of intimidation of a witness. The defendant appeals from the convictions, claiming that the trial judge committed reversible error when he (1) questioned the venire about whether the potential jurors believed the Commonwealth could prove its case beyond a reasonable doubt without presenting scientific evidence; (2) failed to instruct the jury pursuant to *Commonwealth* v. *Bowden*, 379 Mass. 472 (1980); (3) permitted a witness to express an opinion as to the culpability of the defendant; (4) allowed the Commonwealth to introduce evidence of the defendant's prior misconduct, a privileged telephone conversation between the defendant and his wife, and excerpts from a diary that lacked foundation and were not authenticated; and (5) denied the defendant's motion for a required finding of not guilty on the intimidation of a witness charge. The defendant also raises several claims of ineffective assistance of counsel. We affirm the convictions and decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder conviction to a lesser degree of guilt.

1. *Background and prior proceedings.* As to the murder indictment, the Commonwealth proceeded on theories of deliberate premeditation and felony-murder, with armed robbery as the predicate felony. The jury found the defendant guilty under both theories.

The jury could have found the following facts. The defendant and the victim, Henry Guzman, had both been employed at a furniture rental center until the defendant was terminated from his job in early November, 2001; they had also engaged in drug transactions.

On December 13, 2001, the night of the murder, the victim was living in Lawrence with his girl friend, Emily German, and their daughter; he arrived home from his job at approximately 9 P.M. Fifteen minutes later, he received a call on his cellular telephone, and after a brief conversation, he left the apartment, declining to tell German where he was going. He never returned. At 10:30 P.M., a Lawrence police officer engaged in a routine patrol observed the victim's empty automobile behind a supermarket distribution warehouse. A check of the registration turned up nothing suspicious, and the officer left.

That same night, the defendant spent the early part of the evening at home in Haverhill with his girl friend, Michelle Chisholm, and their son. Around 8:30 P.M., the defendant had a heated, twenty-five minute telephone conversation with Kerrilee Dube, his estranged wife. After this call, he engaged in a brief telephone conversation and then told Chisholm that he was "going to meet Henry." The defendant left the apartment driving a 1996 Ford Explorer vehicle, one of two vehicles shared by the couple.

The defendant and the victim communicated by cellular telephone as the defendant traveled from his apartment in Haverhill to the warehouse in Lawrence.[1] The defendant shot the victim at close range, killing him with a single gunshot to the back of the head. The defendant dragged the body down an embankment behind the warehouse.

The defendant subsequently returned to his apartment, stripped off all his clothes, and put them in a plastic trash bag. He and Chisholm drove to Plaistow, New Hampshire, in the Ford Explorer. On the defendant's instruction, Chisholm put the bag with the clothes in a trash barrel that had been set out for collection. The couple drove to a car wash where the defendant washed the vehicle, paying particular attention to the tires; the defendant and Chisholm thoroughly vacuumed the vehicle.

In the days after his disappearance, the victim's family and friends filed a number of missing persons reports and provided police with lists of telephone numbers for calls made to and from the victim's cellular telephone on December 13, 2001. The defendant's telephone number appeared on both of those lists. On December 20, 2001, the defendant was interviewed by police.[2] After that interview, he removed clothing from his closet, asked

[1]Telephone records regarding calls made on December 13, 2001, show eight separate telephone calls between the defendant's cellular telephone and the victim's cellular telephone starting at 8:10 P.M. and ending at approximately 9:50 P.M. Based on expert testimony and records produced by cellular telephone companies, the early calls were connected through cellular telephone towers located near each man's apartment. Starting at approximately 9:25 P.M., however, the tower locations changed, and the final call between the two telephones was connected through a cellular telephone tower near the warehouse in Lawrence where the victim's body was ultimately found.

[2]Police contacted the defendant by telephone on December 19, 2001. The defendant initially denied knowing the victim, but ultimately admitted that he

Chisholm for gloves and a shovel, and told her that "he needed to move the body" because it was in a "ditch" or under a "cliff" near a warehouse; although it could not be seen "unless you go to the edge and look down," he "needed to cover it."

On December 27, 2001, police searched the area surrounding the warehouse and discovered the victim's body under a pile of brush about twenty feet from the warehouse parking lot.[3] The body appeared to have been dragged to that location. The victim had been killed by a single gunshot wound to the back of the head with a .45 caliber projectile. Autopsy examination showed that he had been shot at extremely close range and that the shot would have rendered him immediately unconscious. Tire tracks and skid marks were observed in the warehouse parking lot near where the body was located.[4] In a later search of the area, a single .45 caliber cartridge casing was found in the warehouse parking lot, about thirty to forty yards away from the location where the victim's body had been discovered.[5]

The Commonwealth's theory at trial was that the murder was committed in the course of a robbery. After returning to his apartment on the night of December 13, 2001, the defendant removed fourteen or fifteen "vacuum-packed" marijuana "bricks" from a shopping bag that had not been present in the

had worked with the victim and agreed to meet with police on the following day. At the interview on December 20, the defendant admitted to speaking briefly with the victim on the telephone on December 13 about a possible job. On the day of the interview with police, the defendant changed his cellular telephone number.

[3]After learning that the victim's body had been found, the defendant removed more clothing from the couple's home. He also cleaned the couple's second vehicle, a Ford Probe automobile, removing its front floor mats and a blanket from the trunk.

[4]By the time police executed search warrants for the defendant's apartment and the two automobiles he shared with Chisholm on December 29, 2001, the Ford Explorer had four new tires that had not been on the vehicle on the night of December 13, 2001.

[5]Ballistics examination established that the cartridge had been fired either from a semiautomatic or automatic weapon, but the ballistics expert could not determine whether the projectile that killed the victim and the cartridge casing came from the same weapon. No deoxyribonucleic acid (DNA) or fingerprints were found on the cartridge casing. The murder weapon was not recovered; however, multiple witnesses testified to seeing the defendant, both before and after the murder, with a firearm that had the characteristics of a semiautomatic or automatic weapon.

apartment earlier that evening. The defendant told Chisholm he would "get rid of [the bricks] in the morning" and that he would sell them "cheaper to get rid of them faster."[6] Prior to his meeting with the victim, the defendant, who was unemployed at the time, took no money out of the joint bank account he shared with Chisholm. The next day, the defendant paid Dube one hundred dollars in weekly child support for the first time in more than a month.

While in custody awaiting trial, the defendant wrote several letters to Dube and Chisholm asking them to recant their grand jury testimony or to not testify against him at trial. Based on the letter to Chisholm, the defendant was indicted on a charge of intimidation of a witness pursuant to G. L. c. 268, § 13B.[7]

2. *Juror voir dire.* The defendant contends that the trial judge abused his discretion by questioning members of the venire about whether they believed the Commonwealth must present scientific evidence to prove its case beyond a reasonable doubt. The defendant claims the questioning denied him the right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 (2010); *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 442 (2001).

"We afford a trial judge a large degree of discretion in the jury selection process." *Commonwealth* v. *Vann Long*, 419 Mass. 798, 803 (1995). The judge's duty is to "examine jurors fully regarding possible bias or prejudice where 'it appears that there is a substantial risk that jurors may be influenced by factors extraneous to the evidence presented to them.' " *Commonwealth* v. *Garuti*, 454 Mass. 48, 52 (2009), quoting *Commonwealth* v. *Morales*, 440 Mass. 536, 548 (2003). See generally *Commonwealth* v. *Toolan*, ante 452, 466-468 (2011). In deciding juror impartiality, it is sufficient for the judge to "determine whether jurors [can] set aside their own opinions, [properly]

---

[6]The defendant told Chisholm that he would sell the bricks for $900 apiece. The Commonwealth's expert valued one brick of marijuana at between $700 and $1,200.

[7]The defendant was indicted also on a charge of witness intimidation for the letters to Dube, but that charge was dismissed by the judge prior to trial.

weigh the evidence . . . and follow the instructions of the judge." *Commonwealth* v. *Bryant*, 447 Mass. 494, 501 (2006), quoting *Commonwealth* v. *Leahy*, 445 Mass. 481, 495 (2005). "The scope of a voir dire is in the sound discretion of the trial judge and will be upheld absent a clear showing of abuse of discretion." *Commonwealth* v. *Garuti*, *supra*, and cases cited.

At the request of the Commonwealth, the judge asked potential jurors during individual voir dire whether they believed "the Commonwealth is never able to prove a case beyond a reasonable doubt unless it presents scientific evidence to corroborate witness testimony." Thirty-eight members of the venire responded to some variation of this question[8] either affirmatively or ambiguously; of these, thirty-one were excused for cause.[9]

The question regarding scientific evidence was intended to ferret out potential juror bias regarding the so-called "CSI effect," a theory which posits that "jurors who watch forensic science television programs like 'CSI' will hold prosecutors to an unreasonably high standard of proof because of the prowess displayed by fictional forensic scientists," and will either acquit unjustly or fail to follow a judge's instructions if forensic evidence is not offered as part of the government's case.[10] *Commonwealth* v. *Vuthy Seng*, 456 Mass. 490, 503 (2010). The defendant did not object to the question. Because the issue is unpreserved, we review to determine whether there was error, and, if so, whether it created a substantial likelihood of a miscar-

---

[8]The judge also asked variants such as: "Would you agree or disagree with this statement? In order to prove its case beyond a reasonable doubt, the Commonwealth always has to produce scientific evidence." The judge sometimes asked follow-up questions as well, such as: "If the Commonwealth did not produce scientific evidence, would you feel required to return a verdict of not guilty?"

[9]Of the thirty-one jurors who were excused for cause, twenty-four were excused based on their answers to the question, and seven were excused for other reasons or because of a combination of factors including their answers to the scientific evidence question.

[10]"CSI," or "Crime Scene Investigation," is a popular, fictional television drama that focuses on solving crimes through the use of forensic science. See *Commonwealth* v. *Vuthy Seng*, 456 Mass. 490, 503 (2010). See also *United States* v. *Fields*, 483 F.3d 313, 355 n.39 (5th Cir. 2007), cert. denied, 552 U.S. 1144 (2008) (" 'CSI effect' is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show *CSI: Crime Scene Investigation* has on juror behavior").

riage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

Although anecdotal reports and media coverage have fueled concerns within the legal community about the so-called "CSI effect," there is little empirical evidence supporting its existence. See *Commonwealth* v. *Vuthy Seng*, *supra* at 503-504.[11] Nevertheless, some jurisdictions allow at least some form of voir dire relating to jurors' expectations about the presence or absence of forensic or scientific evidence at trial. See *Charles* v. *State*, 414 Md. 726, 731-739 (2010); *Goff* v. *State*, 14 So. 3d 625, 652-654 (Miss. 2009), cert. denied, 130 S. Ct. 1513 (2010); *State* v. *Taylor*, 317 S.W.3d 89, 94-95 (Mo. Ct. App. 2010). At least one appellate decision in Massachusetts has upheld a conviction where a similar voir dire question was posed. See *Commonwealth* v. *Young*, 73 Mass. App. Ct. 479, 485 (2009).[12] Cf. *Commonwealth* v. *Vuthy Seng*, *supra* at 503.

---

[11]In *Commonwealth* v. *Vuthy Seng*, *supra* at 503-504, we quoted Tyler, Viewing *CSI* and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction, 115 Yale L.J. 1050, 1053 (2006), for the proposition that "there is little objective evidence demonstrating that the [CSI] effect exists." For more recent scholarly inquiry into the "CSI effect," see generally Shelton, Juror Expectations for Scientific Evidence in Criminal Cases: Perceptions and Reality About the "CSI Effect" Myth, 27 T.M. Cooley L. Rev. 1 (2010); Shelton, An Indirect-Effects Model of Mediated Adjudication: The CSI Myth, the Tech Effect, and Metropolitan Jurors' Expectations for Scientific Evidence, 12 Vand. J. Ent. & Tech. L. 1 (2009) (Shelton); Lawson, Before the Verdict and Beyond the Verdict: The CSI Infection Within Modern Criminal Jury Trials, 41 Loy. U. Chi. L.J. 119 (2009); Cole, CSI and Its Effects: Media, Juries, and the Burden of Proof, 41 New Eng. L. Rev. 435 (2007). Studies based on juror surveys show that modern juries do have high expectations that forensic evidence will be presented at trial, but that (1) these expectations are unrelated to watching television programs like CSI; and (2) while some of these expectations may play an indirect role in certain jury verdicts, there is no direct causative link between presentation of scientific evidence and convictions or acquittals of criminal defendants. See Shelton, *supra* at 17-18, 39-43.

[12]In *Commonwealth* v. *Young*, 73 Mass. App. Ct. 479, 485 (2009), the judge asked jurors during voir dire, "[I]f the Commonwealth presented only testimony of witnesses, and presented no corroborating scientific evidence, would you automatically find the defendant not guilty, or would you make an independent assessment of the evidence?" No claim was made that this initial question was improper. The Appeals Court rejected the defendant's argument that exchanges with three of the jurors following this question improperly instructed those jurors that "their determination whether a reasonable doubt existed was limited to evidence presented during the trial," and thus undercut his defense that the police investigation was inadequate. See *id.*, citing *Commonwealth* v.

We conclude that the trial judge did not abuse his discretion questioning the venire about their views on scientific evidence. The questions were tailored to ensure that seated jurors were capable of deciding the case without bias and based on the evidence. The questions did not suggest to potential jurors that a lack of scientific evidence could not be considered in determining whether a reasonable doubt existed as to the defendant's guilt.[13] See *Commonwealth* v. *Young, supra.* The questions did not commit the jury to a verdict in advance and, as posed, did not have the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present. See *Charles* v. *State, supra* at 735-737 (abuse of discretion to ask if jurors could not "convict a defendant without 'scientific evidence,' " because question "suggested that finding the defendant 'guilty' was a foregone conclusion"). See also *Goff* v. *State, supra* at 653-654.

*Bowden*, 379 Mass. 472, 485 (1980). The court concluded that the defendant's right to a fair trial was not affected by the additional inquiries, which sought merely to ascertain that jurors would not *"automatically vote to acquit* due to lack of scientific evidence" (emphasis in original). *Commonwealth* v. *Young, supra.*

[13]Although not directly argued in his brief, the defendant implies that the questions on scientific evidence improperly excluded jurors who might have been sympathetic to a *Bowden* defense. In *Commonwealth* v. *Bowden, supra* at 485-486, we held that it was error to instruct a jury that they could not consider a lack of evidence, including the lack of scientific tests, in determining whether there is reasonable doubt as to a defendant's guilt. See part 3, *infra.* Here, the defendant expressed concern on the third day of empanelment about the number of jurors being dismissed as a result of responses to the scientific evidence question. We have considered, in connection with our review under G. L. c. 278, § 33E, whether the scientific evidence questions, in effect, instructed the jury that they could not consider a lack of scientific evidence in determining whether a reasonable doubt existed as to the defendant's guilt, or otherwise undermined a *Bowden* defense, and conclude that they did not. We agree with the defendant, however, that there is an inherent tension between our holding in *Commonwealth* v. *Bowden, supra,* and questioning the members of the venire about their beliefs regarding scientific evidence, that may in certain circumstances raise the possibility of prejudice to a defendant.

Although in a particular case a judge may exercise her discretion to ask potential jurors about their views regarding scientific evidence, we note that, as the judge in this case observed, it may prove difficult to frame the question in a way that jurors can fully comprehend. In light of this practical difficulty, and the tension between the question and a potential *Bowden* defense, we suggest that such discretion be exercised with caution.

3. *Jury instruction.* The defendant contends that the judge erred by failing to instruct, consistent with our holding in *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980), that the jury could consider "the lack of police investigation [and] the lack of physical evidence" in determining whether there was a reasonable doubt as to the defendant's guilt.[14]

Our decision in *Commonwealth* v. *Bowden, supra,* articulates the principle that a judge may not remove issues of inadequacy of a police investigation or lack of evidence from the jury's consideration, but as we have often stated, "a judge is not required to instruct on the claimed inadequacy of a police investigation." *Commonwealth* v. *Williams*, 439 Mass. 678, 687 (2003), quoting *Commonwealth* v. *Boateng*, 438 Mass. 498, 507 (2003). Because it is within the judge's discretion whether to give such an instruction, and it is not required that it be given, see *Commonwealth* v. *Semedo*, 456 Mass. 1, 16 (2010), the judge did not err in failing to give it. The issues were not removed from the jury's consideration, and the defendant was free to, and did, mount a vigorous defense that focused on the failure of the police to investigate evidence that might have led them to suspect a different person, and the lack of physical evidence tying the defendant to the murder.[15]

4. *Admission of opinion regarding defendant's culpability.* The defendant contends that the judge erred by permitting Chisholm to express during her trial testimony an opinion as to the defendant's culpability. Because there was no objection, we review to determine whether permitting the testimony was error and, if so, whether it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

Chisholm was the prosecution's key witness; she described in

---

[14]The defendant did not object when the judge ruled he would not give the instruction.

[15]The defendant argued that the police investigation "focused on [the defendant] to the exclusion of" all other possible suspects, including people who had admitted seeing the victim that evening and other known acquaintances of the victim. The defendant contended also that the police had failed to produce evidence against him and had failed to follow up on other possible leads, including the tire tracks found at the warehouse and a napkin found inside the victim's car that had what appeared to be a telephone number written on it.

detail most of the defendant's inculpatory conduct on the night
of the victim's murder and in the days that followed. As part of
an over-all defense strategy, defense counsel sought to discredit
Chisholm by suggesting she had fabricated her testimony. Dur-
ing his cross-examination of her, defense counsel attacked
Chisholm's credibility by pointing to inconsistencies between
her trial testimony and prior statements she had made to authori-
ties,[16] and by questioning whether she felt in fear of the defend-
ant in the days and weeks following the victim's murder, sug-
gesting that if the defendant had done the things she testified
about, she would have been afraid.

The prosecutor sought to rehabilitate Chisholm by asking her
about the nonprosecution agreement she had entered into, which
guaranteed that she would not be prosecuted as an accessory
after the fact in return for her truthful testimony. The judge
upheld the defendant's objection to a question on this topic and
suggested that the question be rephrased. The prosecutor asked
Chisholm what she had done that might have subjected her to
prosecution and why she believed she needed a nonprosecution
agreement, and this exchange ensued:

THE WITNESS:     "Getting rid of the clothes and vacuum-
                 ing out the car because I believe
                 something had happened in order for
                 him to do these things."

THE PROSECUTOR: "Yes, well what did you think had oc-
                 curred?"

---

[16]In her initial interview with police on December 28, 2001, Chisholm at
first claimed that the night of the victim's death did not stand out in her mind
and that she did not remember the defendant leaving their apartment that
evening. After further questioning, however, she stated to police that the
defendant had gone out that night and then gave additional incriminating
statements regarding the defendant's actions. When the police sought a second
interview with Chisholm later that day, however, she invoked her Miranda
rights and declined to speak with them. Similarly, Chisholm initially invoked
her right against self-incrimination under the Fifth Amendment to the United
States Constitution when called to testify before the grand jury. She later
agreed to testify in proceedings before the grand jury and at trial under the
terms of a nonprosecution agreement.

The prosecutor sought initially to elicit testimony from Chisholm on direct
examination regarding her inconsistent statements, but the defendant objected
and the judge ruled that this should be done on redirect examination.

THE WITNESS:    "I think and thought [the defendant] killed [the victim]."

THE JUDGE:    "Did you think it that night?"

THE WITNESS:    "No, not the night that I did them. I thought it after the body was found and all the situations going with it. So then I thought that I had a reason to need . . . the agreement . . . ."

The defendant's objection to the prosecutor's next question, if Chisholm thought "something had happened" on the night of December 13, was overruled, and the prosecutor continued:

THE PROSECUTOR:    "I mean what I mean by something had happened, it happened prior to [the defendant] coming home causing him to be throwing out his clothes?"

THE WITNESS:    "Right. I figured something happened but not to the extent that later on — I mean I thought he had robbed someone not killed someone."

It was error to permit the witness to give an opinion regarding the culpability of the defendant as was done in this case.[17] See *Commonwealth* v. *Lodge*, 431 Mass. 461, 467-468 (2000); *Commonwealth* v. *Lennon*, 399 Mass. 443, 445-446 (1987). Chisholm twice explicitly expressed her belief that the defendant had killed the victim, and even in the absence of an objection, the judge should have mitigated the prejudicial effect of her testimony by striking it and instructing the jury to disregard it.

Treating the first and second objections as having preserved the issue, we consider whether the testimony prejudiced the defendant. See *Commonwealth* v. *Lodge, supra.* The error was insubstantial in light of the strong circumstantial evidence of

---

[17]It was not improper, however, for the prosecutor to try to rehabilitate Chisholm's testimony by discussing her nonprosecution agreement and the offense for which she could have been prosecuted. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 263-364 (1989). The defendant had raised the issue of the nonprosecution agreement on cross-examination.

the defendant's guilt. Chisholm provided extensive testimony regarding the defendant's inculpatory actions after the victim's murder, as well as the defendant's incriminating statements, including that he needed "to move the body" and to "cover it" because it could be seen.

Moreover, prior to Chisholm's testimony regarding culpability, defense counsel had already elicited testimony from Chisholm that she had signed a statement for police that said she had asked the defendant whether he had killed the victim. Additionally, the Commonwealth made no reference to Chisholm's opinion as to culpability in closing argument. For these reasons, we are convinced "that, stripping the improper testimony from the other evidence, 'the judgment was not substantially swayed by the error.' " Id. at 468, quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

5. Admission of prior bad act evidence. The defendant contends that the judge erred by allowing the admission of prior bad act evidence in the form of testimony that the defendant (a) possessed a firearm, and (b) argued with Dube over the telephone on the night of the victim's death, and that during this conversation his son stated that he "hated" his father. The defendant argues that even if introduction of the prior bad act evidence had a permissible purpose, it was more prejudicial than probative, and therefore should have been excluded.

a. Firearm evidence. The defendant did not object to testimony from multiple witnesses that he was seen in possession of a "silver" handgun with characteristics similar to that of an automatic or semiautomatic weapon in the days before and after the victim's death.

"Evidence of a defendant's possession of the means to commit a crime within a reasonable time of the crime charged is admissible without proof that that particular means was in fact the one used." Commonwealth v. Evans, 438 Mass. 142, 151 (2002), cert. denied, 538 U.S. 966 (2003). See Commonwealth v. Toro, 395 Mass. 354, 356 (1985). "The fact that a defendant had a weapon that could have been used in the commission of a crime is relevant as a link in tending to prove that the defendant committed that crime." Id. at 357. As stated, the victim was killed with a single .45 caliber projectile. Police recovered a single .45 caliber cartridge casing in the warehouse parking lot

near where the victim's body was found, and determined that it had been fired from an automatic or semiautomatic weapon. Although the murder weapon was never found, the fact that witnesses saw the defendant in possession of an "instrument capable of being used in the commission" of the shooting shortly before and after the victim's death was "relevant as a link in tending to prove" the defendant committed the crime. *Id.* at 356, 357. This testimony was more probative than prejudicial, and the judge committed no abuse of discretion in admitting it. See *id.* at 356 ("fact that, at or about the time of a crime, a defendant had a weapon that could have been used in committing the crime is admissible in the judge's discretion").

b. *Defendant's relationship with Dube and son.* The judge allowed Dube to testify that on December 13, 2001, shortly before the defendant left his apartment to meet the victim, she and the defendant engaged in a protracted argument over the telephone regarding visitation with their children. Dube testified that during the course of this argument, the defendant accused her of "brainwashing" their children against him; she asked the son whether he wanted to visit his father that weekend and the son started crying, saying that he did not want to visit his father and that he "hated" the defendant. Because the defendant objected to this testimony, we review its admission under a prejudicial error standard. See *Commonwealth* v. *Montez*, 450 Mass. 736, 744 (2008) (where evidence is relevant, judge must determine that its probative value outweighs undue prejudice that may flow from it).

"It is well settled that the prosecution may not introduce evidence of a defendant's prior or subsequent bad acts for the purpose of demonstrating bad character or propensity to commit the crime[s] charged." *Commonwealth* v. *Butler*, 445 Mass. 568, 574 (2005), quoting *Commonwealth* v. *Barrett*, 418 Mass. 788, 793 (1994). Relying on *Commonwealth* v. *LeBeau*, 451 Mass. 244, 260-261 (2008), the Commonwealth argues that the evidence was admissible for other, probative purposes, and in particular suggests that the evidence that the defendant was enraged shortly before the murder was relevant to the defendant's state of mind.[18]

---

[18]In *Commonwealth* v. *LeBeau*, 451 Mass. 244, 245-246 (2008), the defend-

The testimony does not support an inference that the defendant was enraged; it also provides no support for the Commonwealth's theory that the murder was planned and executed not in a rage, but coolly, with a single gunshot to the back of the head. As such, it was not sufficiently connected with the facts of this case and should not have been admitted. See *Commonwealth* v. *Butler, supra*; *Commonwealth* v. *Barrett, supra* at 793-794. As Justice Kaplan noted in *Commonwealth* v. *Jacobs*, 52 Mass. App. Ct. 38, 44 (2001), "bad acts have been admitted with considerable (and sometimes perhaps undue) liberality in recent years." We are not inclined to extend the principle permitting bad acts evidence as probative of state of mind to evidence of an argument between a defendant and a third party in a case charging the defendant with the murder of a victim unrelated to the third party, in the absence of a connection between such evidence and the circumstances of the crime.

While the testimony should not have been admitted, we are convinced that the testimony did not unduly prejudice the defendant because it was insubstantial in light of the strong circumstantial evidence of the defendant's guilt, and because there was other evidence admitted at trial regarding the poor relationship between the defendant and Dube and his children.[19] See *Commonwealth* v. *Womack*, 457 Mass. 268, 275 (2010) (no prejudice

---

ant was convicted of murdering the victim while robbing him of approximately $400 and several items of value. We upheld admission, as both relevant to a defendant's state of mind and more probative than prejudicial, evidence that the defendant had flirted with a female bartender (and, inferentially, had been rebuffed) on the night of the murder; had been ordered to pay $25,000 in back child support; and needed to repay one hundred dollars to avoid criminal charges on an unrelated matter within a matter of days. See *id.* at 260-261. Other evidence showed that the victim had played the game Keno at the same bar during the late afternoon and had displayed his $400 in winnings to patrons, who continued to talk about the victim's winnings for hours after he left; and that the victim had been bludgeoned to death by repeated blows with a blunt instrument. See *id.* at 246-247. The testimony at issue therefore served not only to place the defendant at the same bar on the night of the murder, but also was reflective of his state of mind and possible motive for the murder when he left the bar after 2:45 A.M.

[19]Chisholm had testified to overhearing the conversation between Dube and the defendant shortly before he left the apartment to see the victim; she stated that the conversation was about visitation with his children and that it "wasn't happy." Several letters written by the defendant and read in evidence referenced the defendant's poor relationship with Dube and his children.

or substantial likelihood of a miscarriage of justice from erroneous admission of cumulative testimony).

6. *Admission of telephone conversation.* The defendant claims also that the judge erred in allowing Dube to testify about her telephone conversation with the defendant on December 13, 2001, because she was still married to the defendant at that time and thus was disqualified from testifying about the conversation pursuant to G. L. c. 233, § 20.[20]

Section 20, First, of G. L. c. 233 provides in pertinent part that "neither husband nor wife shall testify as to private conversations with the other." "This rule is one of disqualification, not privilege, and spouses are forbidden, on objection, to testify about the contents of their private conversations." *Commonwealth* v. *Walker*, 438 Mass. 246, 254 (2002). The disqualification does not apply if a third person was present while the conversation was going on; the third person need not have heard the entire conversation to remove the conversation from the purview of the statute. See *Fay* v. *Guynon*, 131 Mass. 31, 33 (1881) (discussing predecessor marital disqualification statute). See also *Linnell* v. *Linnell*, 249 Mass. 51, 54 (1924).

In this case, Chisholm testified that she overheard the defendant's side of the telephone conversation while moving about the apartment on the night of December 13, that she understood that the defendant was arguing about "[v]isiting his kids," and that the conversation "wasn't happy." The apartment was small, and Chisholm had interacted with the defendant immediately before and after the telephone call. It could thus reasonably be inferred that the defendant was aware that Chisholm was at home and that she could overhear the conversation. Dube testified also that her son, who was five years old at the time, was present during at least part of her argument with the defendant and had spoken to the defendant over the telephone about visiting the defendant. This testimony supports the judge's determination that the telephone conversation was not private, and that Dube was not disqualified from testifying regarding her conversation with the defendant. There was no error.

7. *Admission of Dube's journal.* At trial, the Commonwealth

[20]The judgment of divorce between Dube and the defendant did not become final until January 31, 2002.

introduced in evidence portions of an electronic journal in which Dube had recorded entries during December of 2001. The journal contained numerous entries about Dube's interactions with the defendant, including one detailing their telephone argument on the night of the victim's murder, but did not contain any mention of a face-to-face meeting with the defendant that evening. The prosecutor offered the journal as a prior inconsistent statement — or inconsistent omission — contradicting Dube's trial testimony that the defendant had visited her that evening at approximately 10:15 P.M. and had stayed for about one-half hour. The journal entries were admitted over the defendant's objection on the grounds that they were not properly authenticated and that there was an insufficient foundation to establish that Dube would have written about an alleged visit with the defendant on the night of the victim's murder.

a. *Authenticity.* "[P]roof of authenticity usually takes the form of testimony of a qualified witness either (1) that the thing is what its proponent represents it to be, or (2) that circumstances exist which imply that the thing is what its proponent represents it to be." *Commonwealth* v. *LaCorte*, 373 Mass. 700, 704 (1977), quoting W.B. Leach & P.J. Liacos, Massachusetts Evidence 265 (4th ed. 1967). See *Commonwealth* v. *Siny Van Tran, ante* 535, 549-551 (2011). See also Mass. G. Evid. § 901(a) (2011). Here, Dube testified that she kept a journal in December of 2001. State Trooper Barry Brodette, a member of the police investigation team, testified that when he interviewed Dube following the victim's murder, she gave him a copy of pages from this journal. There was no error in the judge's conclusion that this testimony sufficed to authenticate the journal and establish its chain of custody.

b. *Foundation.* A prior inconsistent statement is one that, "either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942). "An omission from the earlier statement is inconsistent with a later statement of fact when it would have been natural to include the fact in the initial statement." *Commonwealth* v. *Ortiz*, 39 Mass. App. Ct. 70, 72 (1995), citing *Foster* v. *Worthing*, 146 Mass. 607, 608 (1888).

See Mass. G. Evid., *supra* at § 613(a)(2), at 188. Dube testified that she made entries in the journal on a daily basis about things of interest to her life, particularly her interactions with the defendant. This testimony, coupled with the fact that the journal itself showed daily entries focusing almost exclusively on, and providing details about, Dube's interactions with the defendant, provided a sufficient foundation for a jury to infer that Dube would have written about any face-to-face meeting with the defendant on December 13, 2001. There was no error in the judge's conclusion that the absence of a journal entry regarding a visit from the defendant on the night of the victim's murder qualified as a prior inconsistent statement to Dube's trial testimony that the defendant visited her in person on the night of the murder.

c. *G. L. c. 233, § 23.* Pursuant to G. L. c. 233, § 23, a party who produces a witness may prove that the witness has made prior inconsistent statements, "but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them." Consistent with this requirement, Dube should have been told of the inconsistent omission and given an opportunity to explain it. See *Commonwealth* v. *McIntosh*, 259 Mass. 388, 390-391 (1927).

The defendant did not raise this error on appeal and made no objection on this ground at trial. We therefore review for a substantial likelihood of a miscarriage of justice.

As stated, the journal was offered, at least in part, as a prior inconsistent omission impeaching Dube's trial testimony that she had a face-to-face meeting with the defendant at her apartment on the night of December 13, 2001. Dube testified that this meeting — which would have occurred only a few blocks away from the defendant's apartment — started "after 10 [P.M., around] 10:15" P.M., and lasted for "[a]bout a half an hour." She testified also that she did not observe the defendant placing any telephone calls during this conversation. Her testimony therefore might have provided the defendant with a partial alibi, or at least created some doubt as to the prosecution's theory that the defendant had killed the victim around 9:45 P.M. and

then placed a 911 call from the victim's cellular telephone at 10:36 P.M. to mislead police as to the time and place of the defendant's death.[21]

Although Dube was not given the chance to explain her omission, there was little harm to the defendant. Even if taken at face value, Dube's testimony that she saw the defendant at around 10:15 P.M. neither directly contradicted the timeline offered by the prosecution nor provided a complete alibi to the defendant. See *Commonwealth v. Palladino*, 346 Mass. 720, 725 (1964). Other evidence showed that the victim and the defendant spoke by telephone for the last time around 9:45 P.M., when both were in the vicinity of the warehouse; that the victim was rendered "immediately" unconscious by the bullet which killed him and that his cellular telephone was never located; that a police officer had observed the victim's empty vehicle behind the warehouse at 10:30 P.M.; and that the defendant returned to the apartment he shared with Chisholm around 11 or 11:30 P.M. It was therefore entirely conceivable that the defendant could have committed the murder, visited briefly with Dube, and made the telephone call from the victim's telephone before returning to his apartment. In addition, Dube was presumably available to be recalled to the stand to explain the inconsistencies; defense counsel may have made the decision not to do so for tactical reasons.[22] See *Commonwealth v. Hart*, 455 Mass. 230, 241-242 (2009). See also *Commonwealth v. Velazquez*, 61 Mass. App. Ct. 667, 676 (2004), cert. denied, 546 U.S. 850 (2005). For these reasons, any harm to the defendant from the admission of the "omitted" journal entry was negligible and was unlikely to have influenced the jury. There was no substantial likelihood of a miscarriage of justice.

[21]The victim's cellular telephone was never recovered. Telephone records revealed that a 911 call was placed at 10:36 P.M., but the caller did not speak into the telephone, and the cellular telephone tower location used to connect the call could not be determined.

[22]Dube's credibility was already in question regarding the potential alibi because she had testified that she was in love with the defendant and that the defendant had repeatedly asked her to recant her grand jury testimony or otherwise not testify against him at trial. To have recalled Dube to discuss her prior inconsistent omission from the journal entry might have both emphasized this inconsistency in the minds of the jury and also subjected Dube to cross-examination about her feelings for the defendant and other inconsistent statements she had made that were potentially favorable to the Commonwealth.

For similar reasons, we conclude also that there was no substantial likelihood of a miscarriage of justice when Trooper Brodette was allowed to testify, without objection, that Dube did not mention the alleged visit from the defendant during her interviews with police.

8. *Sufficiency of evidence of witness intimidation.* The defendant contends that the judge erred in refusing to grant his motion for a required finding of not guilty on the charge of witness intimidation. In reviewing a denial of a motion for a required finding of not guilty, we ask whether, viewing the evidence in the light most favorable to the Commonwealth, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).

The language of the witness intimidation statute in effect at the time the defendant was indicted imposed criminal sanctions on:

> "Whoever, directly or indirectly, willfully endeavors by means of a gift, offer or promise of anything of value, or by misrepresentation, intimidation, force or express or implied threats of force, to influence, impede, obstruct, delay or otherwise interfere with any witness or juror in any stage of a trial, grand jury or other criminal proceeding . . . ."

G. L. c. 268, § 13B, as amended through St. 1996, c. 393, §§ 2-4. "Conviction of witness intimidation under G. L. c. 268, § 13B, requires the Commonwealth to prove beyond a reasonable doubt that '(1) the target of the alleged intimidation was a witness in a stage of a criminal proceeding, (2) the defendant wilfully endeavored or tried to influence the target, (3) the defendant did so by means of intimidation, force, or threats of force, and (4) the defendant did so with the purpose of influencing the complainant as a witness.' " *Commonwealth* v. *Robinson*, 444 Mass. 102, 109 (2005), quoting *Commonwealth* v. *McCreary*, 45 Mass. App. Ct. 797, 799 (1998).

While in custody awaiting trial, the defendant wrote a letter to Chisholm in which he sought to convince her either to recant

her grand jury testimony or not to testify at trial. He sent this letter to Dube, who read it over the telephone to Chisholm. According to Chisholm, the letter stated:

"That I had three options to change my story. I could either sign an affidavit saying that I lied. I could disappear for the week of the trial or however long it takes. And there was a third option. I'm not too sure what the third one was. But the end result was I don't have to worry about what happens after trial because I would have been doing him a favor by not testifying."

The letter suggested also that Chisholm should claim she was coerced into testifying before the grand jury.[23]

We reject the defendant's contention that there was insufficient evidence from which the jury could conclude that he attempted to influence a witness "by means of intimidation." See *Commonwealth* v. *Robinson, supra*. Intimidation for purposes of the statute has been defined as "putting a person in fear for the purpose of influencing his or her conduct." *Commonwealth* v. *McCreary, supra*. "[A]n 'action does not need to be overtly threatening to fall within the meaning of "intimidation." ' " *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 124 (2010), quoting *Commonwealth* v. *Casiano*, 70 Mass. App. Ct. 705, 708 (2007). "[T]he context in which [an] allegedly threatening statement [is] made and all of the surrounding circumstances" may also be taken into account. *Commonwealth* v. *Sholley*, 432 Mass. 721, 725 (2000), cert. denied, 532 U.S. 980 (2001). See *Commonwealth* v. *Cohen (No. 1)*, *supra* (timing of defendant's actions a factor).

Based on Dube's testimony, the defendant's letter stated that if Chisholm recanted her grand jury testimony or disappeared during the trial, she would not "have to worry about what happen[ed] after trial." It was written after the defendant had expressed repeatedly to Dube his concerns about Chisholm's potential inculpatory testimony, and requested repeatedly that Dube recant her own grand jury testimony and help convince

---

[23]After Dube read the letter to Chisholm over the telephone, Chisholm told Dube she did not want it, so Dube discarded it. Both Dube and Chisholm testified similarly as to the contents of the letter.

Chisholm to do the same. Combined with Chisholm's other testimony at trial, that the defendant had at times physically abused her and that, during the police investigation, he had instructed her not to speak to police and had kept her under surveillance to ensure that she did as she was told, the evidence was sufficient to permit a rational juror to infer that the letter was intended to intimidate Chisholm so that she would alter her testimony.

9. *Ineffective assistance of counsel.* The defendant claims ineffective assistance of counsel based on his attorney's failure to (1) object to the scientific evidence question during the venire voir dire; (2) object to Chisholm's opinion regarding the defendant's culpability; and (3) adequately prepare for argument on the motion for a required finding of not guilty on the charge of witness intimidation. In cases involving review pursuant to G. L. c. 278, § 33E, claims of ineffective assistance of counsel are reviewed under the more favorable "substantial likelihood of a miscarriage of justice" standard. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

As discussed in parts 2 and 8, *supra*, there was no error in the judge's decisions to permit the scientific evidence question and to put the witness intimidation charge to the jury, and therefore a claim of ineffective assistance of counsel on these grounds must also fail. Although the same cannot be said for defense counsel's failure to object to the admission of Chisholm's opinion regarding the defendant's culpability, as discussed in part 4, *supra*, the defendant was not prejudiced by the admission of this testimony. There was no substantial likelihood of a miscarriage of justice resulting from counsel's failure to object.

10. *Relief pursuant to G. L. c. 278, § 33E.* Having reviewed the entire record pursuant to G. L. c. 278, § 33E, we conclude that there is no reason to order a new trial or to reduce the defendant's murder conviction to a lesser degree of guilt.

*Judgments affirmed.*