31 A.3d 922

**Kenneth Gerald STABB**

v.

**STATE of Maryland.**

**No. 2, Sept. Term, 2011.**

Court of Appeals of Maryland.

Nov. 22, 2011.

Mark Colvin, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner.

Brenda Gruss, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, * MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

This case concerns the propriety of an "anti-CSI effect," or "no duty," jury instruction, given before closing arguments in a criminal trial, that instructed the jury that there is "no legal

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision or adoption of this opinion.

requirement that the State utilize any specific investigative technique or scientific test to prove its case." We addressed a similar issue recently in *Atkins v. State*, 421 Md. 434, 26 A.3d 979 (2011), and revisit it here primarily to provide additional guidance to Bench and Bar when confronted with requests (usually from the State) for this (or a similar) type of jury instruction seeking to avert the purported "CSI effect." Since filing our opinion in *Atkins*, there have been published or made available no additional empirical studies that convince us that a "CSI effect" even exists, and, if it does, whether the effect is likely to influence unduly the final verdict. Although we continue to believe that "anti-CSI effect" or "no duty" instructions are not per se improper necessarily, we conclude, for reasons that we shall explain, that the trial court, in the context of the present case, abused its discretion in giving an "anti-CSI effect" jury instruction. Accordingly, we shall reverse the judgment of the Court of Special Appeals and direct remand of the case to the Circuit Court for Wicomico County for a new trial.

## I. Factual and Procedural Background

Kenneth Gerald Stabb, Petitioner, was convicted by a jury, sitting in the Circuit Court for Wicomico County, of one count of third-degree sexual assault and one count of second-degree assault. In the State's case-in-chief at Stabb's 27 April 2009 trial, eight-year-old Kaylen J., who was seven years old at the time of the assault, testified that, on 17 August 2008, she was sitting on the hood of her mother's van, parked in front of the family home in Salisbury, Maryland, when Stabb touched her "private" with his hand, inside of her underwear. Kaylen J. continued that Stabb told her, "If you tell anyone I'll kill you." Kaylen J. related that her mother, Melissa R., ran out of the house, took Kaylen J. off the hood of the van, brought her inside, and someone "called the cops." Before the incident, Kaylen J. said that she liked Stabb, and thought he was nice and funny.

Officer Jonas Berry testified for the State that he responded to Kaylen J.'s family home at 11:40 p.m. (based on a

telephone complaint), spoke with Melissa R., and interviewed Kaylen J. briefly. He observed that Kaylen J. appeared "off-set, skittish, very introverted," with shaking hands and pulling nervously on her nightgown during the interview. Kaylen J. told Officer Barry that Stabb "touched her pee pee" on the inside of her underwear. Kaylen J. began to cry, so Barry ended the interview and went looking for Stabb. He found Stabb asleep in his home nearby and informed him that he was under arrest for a sexual assault on Kaylen J. Stabb professed his innocence, but was taken into custody. Officer Barry referred Kaylen J. to the Child Advocacy Center ("CAC"), but, because there was no reported penetration during the assault, he did not refer her for medical treatment.

The State called next Phillip R., Kaylen J.'s uncle, who testified that he saw Stabb outside the house on the evening of the incident. He saw Kaylen J. greet Stabb with a hug, which was not unusual, and later saw Kaylen J., on the hood of the van, with Stabb's arms around her closely. When Kaylen J. went into the house, she looked scared. He thought Stabb had been drinking, based on his actions and the smell of alcohol on his breath.

Heather Sullivan, a licensed graduate social worker employed by the CAC, was called as a State's witness. Sullivan interviewed Kaylen J. at the CAC on 21 August 2008. A video and audio recording of the interview was made, and portions of it were replayed for the jury. In the recording, Kaylen J. identified parts of the human body on drawings and on dolls, and demonstrated on them where Stabb touched her. Sullivan was cross-examined as to why she did not refer Kaylen J. for a Sexual Assault Forensics Exam ("SAFE"). Sullivan responded that a SAFE is done to treat injuries and determine whether there is any physical evidence of sexual assault. Kaylen J. was not referred for a SAFE because she did not disclose that penetration occurred. Defense counsel pressed Sullivan about the potential for obtaining any kind of physical evidence had a SAFE been performed on Kaylen J. Sullivan responded that there was no possibility of the continued existence on 21 August 2008 of physical evidence as it had

been several days between the assault and Kaylen J.'s interview at the CAC. By that time, Kaylen J. had changed clothing and bathed. Moreover, Sullivan opined that it was not in Kaylen J.'s best interest to undergo a full pelvic exam, in the absence of previous disclosure of penetration. The State rested its case-in-chief at this point.

Defense counsel requested dismissal of the case, which was denied. The jury was excused for lunch and the trial judge, defense attorney, and prosecutor addressed administrative matters, including the verdict sheet and proposed jury instructions. The trial judge anticipated argument over the State's requested lack of scientific evidence jury instruction (presumably generated by the exchanges over the absence of a SAFE of Kaylen J. and on what physical evidence might have been obtained had such been carried out), and questioned defense counsel as to whether she had reviewed the pertinent case law. Defense counsel confirmed an appreciation for *Evans v. State*, 174 Md.App. 549, 922 A.2d 620, *cert. denied*, 400 Md. 648, 929 A.2d 890 (2007). At that point, the jury returned, and trial resumed.

Melissa R. was called as the first witness by the defense. She testified that, on August 17, she saw Stabb leaning over and whispering to her daughter (then seated on the van), so she ran out of the house, took Kaylen J. from the hood of the van, and brought her inside. Kaylen J. had a "look of pure horror." Melissa R. also said that Kaylen J. told her that Stabb told her to "spread her legs, then spread them wider," and that she was scared. Melissa R. acknowledged that she had an intimate relationship with Stabb (which she did not disclose to the investigating police) which began to sour shortly before the assault of Kaylen J. After learning of the assault, Melissa R. went to a nearby convenience store to tell a friend about the incident. The friend instructed Melissa R. to call the police, which she did.

The defense then called Jane R., Kaylen J.'s grandmother. Jane R. had been in her bedroom of the family home at the time of the alleged assault. She testified that she saw Stabb

leaning over Kaylen J., seated on the hood of the van, with her nightgown pulled over her knees, and looking frightened. Jane R. urged Melissa R. to retrieve Kaylen J. immediately. Several weeks before the assault, Jane R. sent Stabb a letter stating that Kaylen J. was upset by Melissa R. and Stabb spending so much time together and urging Stabb to "back off," but not to show the letter to Melissa R. Stabb shared the letter with Melissa R. anyway, shortly after it was received.

During a recess, the trial judge, the prosecutor, and defense counsel discussed jury instructions again. The one proposed by the State, at issue in this case, provided:

> During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not use a specific investigative technique or scientific test. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all the evidence or lack of evidence in deciding whether a defendant is guilty. *However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.* Your responsibility as jurors is to determine whether the State has proven based upon all the evidence the defendant's guilty beyond a reasonable doubt. [Emphasis added.]

Stabb's attorney objected to the instruction, arguing that the facts of Stabb's case were distinguishable from those in *Evans,* 174 Md.App. at 549, 922 A.2d at 620, where the Court of Special Appeals approved the use of the same jury instruction:

> **Defense Counsel:** I would incorporate all of the arguments that the defense in [*Evans* ] made as far as the shift—the burden shifting. *I would point out that its not a pattern instruction, and that maybe one day could be, but it's not now.* And given the facts of this case, and how the facts were generated, in that they were not generated by cross-examination, I would ask the court to just give the pattern instructions as to evidence, direct and circumstantial evidence, and reasonable doubt and not to give any specialized instruction in this case. . . . [Emphasis added.]

**The Court:** All right your objection is noted. Did [the State] want to be heard?

**The State:** Your Honor, . . . . It will nonetheless be a vigorous argument that [Defense Counsel] makes in closing. The State believes that it's an appropriate instruction, and I would ask the Court to give it.

**Defense Counsel:** If the Court determines after I gave my closing argument that I gave a vigorous—then I would ask the Court to consider it, but to give it prior to the closing argument and without making any conclusion that I made a robust or vehement argument and basically harped on that fact, I would say its improper.

With the jury back in the box, defense counsel called Robin Stabb, Stabb's ex-wife, as an alibi witness. Ms. Stabb testified that she was with Stabb on 18 August 2008 from approximately 11:00 p.m. (when she picked him up in her van) to 11:30 p.m. (when she dropped him off at his house).

Defense Counsel then called Stabb, who testified that, on the evening of 17 August 2008, he saw Melissa R. outside the convenience store near her house, bought her cigarettes and beer, and upon noticing the ex-Mrs. Stabb sitting in her van across the street, left the store and entered Ms. Stabb's van. Stabb continued that thereafter he left Ms. Stabb's van, walked directly to his house, and fell asleep. Stabb also claimed that, during another interview by a policeman named Detective Seichepine, the detective told him that his DNA was found on Kaylen J. Stabb responded to that revelation by asserting that his DNA was "not on that child."

The State called Detective Seichepine as a rebuttal witness. On cross-examination by defense counsel, Detective Seichepine admitted that he told falsely Stabb that an exam had been performed on Kaylen J. On redirect examination, the State questioned the detective whether a SAFE would have yielded any medical evidence, to which the detective responded that the possibility was "very minimal." When questioned further by the State, Seichepine testified specifically that he had never heard of anyone obtaining fingerprints from a

SAFE. During recross-examination, the detective claimed that DNA evidence could be found in skin-to-skin contact.

After the defense rested and before closing arguments, the trial judge gave the jury its instructions, including the scientific evidence instruction, *supra*, to which the Court noted defense counsel's objection. In her closing argument, defense counsel focused heavily on the State's reliance on a single child witness and the inconsistent recollections of the investigating officers and the State's other witnesses. She also covered briefly the motive of Jane R. and Melissa R. to encourage Kaylen J. to implicate Stabb, the possibility of an alternative assailant, Stabb's alibi witnesses, and the lack of physical evidence.

After almost two hours of deliberation, the jury returned a verdict of guilty on both of the counts with which Stabb was charged. At the 13 May 2009 sentencing hearing, after merging the convictions for sentencing purposes, the judge sentenced Stabb to eight years in prison, with all but four years suspended.

On 13 May 2009, Stabb noted timely an appeal to the Court of Special Appeals. A panel of the intermediate appellate court, in an unreported opinion, concluded that, based on that court's holding in *Evans*, 174 Md.App. at 549, 922 A.2d at 620, the jury instruction regarding scientific evidence was proper, affirming the judgment of the Circuit Court. The Court of Special Appeals's decision was filed prior to our decision in *Atkins*, which did not overrule explicitly the holding in *Evans*, but created a new basis for evaluating the giving of "anti-CSI effect" jury instructions. Also before we decided *Atkins*, Stabb filed a petition for writ of certiorari with this Court. We granted the petition, *Stabb v. State*, 418 Md. 397, 15 A.3d 298 (2011), to consider the following question:

Did the trial court err in instructing the jury that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case?

Based on *Atkins*, we conclude that, although we remain persuaded that "anti-CSI effect" jury instructions are not improp-

er per se, under the facts of this case, the trial court abused its discretion in providing essentially a preemptive jury instruction that there was "no legal requirement for the State to utilize any specific investigative technique or scientific test to prove its case." Therefore, we reverse the judgment of the Court of Special Appeals and remand with instructions to remand further the case to the Circuit Court for Wicomico County for a new trial consistent with this opinion.

## II. Discussion

 Article 21 of the Maryland Declaration of Rights [1] and the Sixth Amendment to the United States Constitution grant to criminal defendants the right to a fair trial, which includes a requirement that trial judges refrain from making statements that may influence improperly the jury. *Butler v. State*, 392 Md. 169, 192, 896 A.2d 359, 373 (2006); *see also Gore v. State*, 309 Md. 203, 214, 522 A.2d 1338, 1343 (1987) (stating that "it is generally improper for a trial judge to show his or her opinion of those matters upon which the jury will eventually pass"). Article 23 of the Maryland Declaration of Rights [2] states that "the Jury shall be the Judges of the Law, as well as of fact . . . ," which limits the trial court from giving jury instructions that comment on evidence properly before

---

**1.** Article 21 of the Maryland Declaration of Rights states:

Article 21. Rights of accused; indictment; counsel; confrontation; speedy trial; impartial and unanimous jury: That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

**2.** Article 23 of the Maryland Declaration of Rights states:

Article 23. Jury judges law and fact; right of trial by jury in civil proceedings. In the trial of all criminal cases, the Jury shall be Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction. The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $15,000, shall be inviolably preserved.

the jury. *Gore,* 309 Md. at 210, 522 A.2d at 1341. Trial judges occupy a position of such authority in a court room that they "should be exceedingly careful in any remarks made ... during the progress of a trial, either in passing upon evidence or ruling upon prayers, and should carefully refrain, either directly or indirectly, from giving expression to an opinion upon the existence or not of any fact, which should be left to the finding of the jury...." *Gore,* 309 Md. at 212, 522 A.2d at 1342 (quoting *United Rys. & Elec. Co. v. Carneal,* 110 Md. 211, 232–33, 72 A. 771, 775 (1909)). The proper role of the trial court in delivering jury instructions is to "aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Chambers v. State,* 337 Md. 44, 48, 650 A.2d 727, 729 (1994). Maryland Rule 4–325(c) guides trial courts in delivering jury instructions:

> **How given.** The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

We said in *Thompson v. State,* 393 Md. 291, 302–303, 901 A.2d 208, 214 (2006) (quoting *Ware v. State,* 348 Md. 19, 58, 702 A.2d 699, 718 (1997)), that Rule 4–325(c) "requir[es] the trial court to give a requested instruction under the following circumstances: (1) the requested instruction is a correct statement of law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given."

An improper, objectionable instruction includes one that serves to relieve the state of its burden to prove a defendant's guilt beyond a reasonable doubt. *State v. Evans,* 278 Md. 197, 207, 362 A.2d 629, 635 (1976). In order to preserve for appeal properly, an objection to a particular jury

instruction, a party must make timely an objection, after the instruction is given, that states the particular grounds of the objection. *Gore,* 309 Md. at 207, 522 A.2d at 1339 (explicating Md. Rule 4–325(e)). The timing of the objection is important because it should give the trial court an opportunity to correct the instruction in light of a well-founded objection. *Gore,* 309 Md. at 209, 522 A.2d at 1340 (citing *Bennett v. State,* 230 Md. 562, 568, 188 A.2d 142, 145 (1962)).

■ A Maryland appellate court reviews a trial court's refusal or giving of a jury instruction under the abuse of discretion standard. *Gunning v. State,* 347 Md. 332, 351, 701 A.2d 374, 383 (1997). We stated in *In re Don Mc.,* 344 Md. 194, 201, 686 A.2d 269, 272 (1996) (quoting *State ex rel. Carroll v. Junker,* 79 Wash.2d 12, 482 P.2d 775, 784 (1971)):

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

■ We consider the following factors when deciding whether a trial court abused its discretion in deciding whether to grant or deny a request for a particular jury instruction: (1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given. *Gunning,* 347 Md. at 348, 701 A.2d at 381 (citing *Grandison v. State,* 341 Md. 175, 211, 670 A.2d 398, 415 (1995), *cert. denied,* 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996)). In addition to the general framework established for evaluating challenges to jury instructions, we spoke directly to the specific jury instruction at issue in the present case in *Atkins.*

### A. *Atkins v. State*

Atkins was convicted of three counts of second-degree assault stemming from a physical altercation of unexplained origin that culminated eventually in Atkins drawing a foldable-blade pocketknife and wounding three people. *Atkins*, 421 Md. at 438–39, 26 A.3d at 981. Three days later, police obtained a search warrant for Atkins' home and retrieved a 12–inch–long (6 inch, non-foldable blade), black knife from his bedside table. *Atkins*, 421 Md. at 439, 26 A.3d at 981. At trial, the State relied heavily on this knife as evidence of the crime, while the defense counsel focused on the lack of physical evidence collected from the knife tying it to the crime through DNA or fingerprints. *Atkins*, 421 Md. at 440–42, 26 A.3d at 981–83. Moreover, an eyewitness called by the State testified that she saw a silver (not black) knife used by Atkins at the affray. The trial court, over Atkins's objection, delivered the same scientific evidence jury instruction at issue in the present case. *Atkins*, 421 Md. at 441–42, 26 A.3d at 982–83. The Court of Special Appeals, based on its holding in *Evans*, 174 Md.App. at 549, 922 A.2d at 620, affirmed the trial court's use of the jury instruction. We reversed, however, finding that the "instruction was not proper under the facts of the case, was fairly covered in the instructions actually given, and, rather than solving a problem arising from the circumstances of the case, created a problem that unfairly prejudiced the defendant's case." *Atkins*, 421 Md. at 447, 26 A.3d at 986.

In *Atkins*, we stated that the most important consideration in evaluating whether a trial judge abused his/her discretion in giving a scientific evidence jury instruction is whether the "instruction will run afoul of the prohibition against relieving the State of its burden where ... its relation [of the instruction] to the reasonable doubt standard [is] unclear." 421 Md. at 451, 26 A.3d at 988 (quoting *Evans*, 174 Md.App. at 571, 922 A.2d at 633). Further, we evaluated whether there was a need for a curative instruction to clarify the State's burden as it relates to specific investigative techniques or scientific tests. *Id.* We concluded that defense counsel questioned properly the lack of evidence presented by the State by asking, during

cross-examination of police witnesses, whether the police were capable of looking for blood or skin cells on the knife recovered from Atkins's bedroom during a "legitimate, brief, and reasonable inquiry." *Atkins*, 421 Md. at 452–53, 26 A.3d at 989 (relying on *Sample v. State*, 314 Md. 202, 207, 550 A.2d 661, 663 (1988), where we stated that when "the State has failed to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity, the defendant ought to be able to comment on the absence of such evidence"). Under the circumstances in *Atkins*, the jury instruction constituted an improper comment on the weight of the evidence, thus abrogating Atkins's protected right to a fair trial. 421 Md. at 453, 26 A.3d at 989. We found that the instruction "directed the jury to ignore the fact that the State had not presented evidence connecting the knife to his crime, implying that the lack of such evidence is not necessary or relevant to the determination of guilt, and to disregard any argument by the defense to the contrary." *Id.*

## B. The "CSI Effect" Redux

The concurring opinion in *Atkins* considered at length the reputed underpinning for giving instructions like that given in *Atkins* or here, the so-called "CSI effect," the competing theories about the "effect," and the inconclusive state of scholarly research on the topic.[3] The "CSI effect" refers generally to various theories that assert that exposure to courtroom or criminal investigative fictional media may influence jurors' objective evaluation of an actual trial. Since

---

**3.** Many prosecutors hold the view that perhaps some potential jurors, over time, acquire, from watching television crime dramas and/or reading popular print media reports on the forensic capacities of scientific tests (some falling in the realm of speculation), an unrealistic expectation for certain forensic investigations or techniques, such as "DNA sequencing, fingerprint analysis, and ballistics analysis," and this expectation impacts their ability to evaluate reasonable doubt in the absence of such evidence. *Atkins*, 421 Md. 434, 458, 26 A.3d 979, 992 (2011). On the other hand, the findings of one study suggest that the "CSI effect" can "promote the modern jury's desire to see that people are punished for the crimes they commit." *Atkins*, 421 Md. at 460, 26 A.3d at 995.

*Atkins* was decided, several additional studies have been published, or access to them made available, with equally inconclusive results as reported in the *Atkins* concurrence. One study used a "science-rich" episode of *The Simpsons* television cartoon comedy to evaluate the influence of the episode on viewers' perception of science. *See* Lindy A. Orthia, et al., *How Do People Think About the Science They Encounter in Fiction? Undergraduates investigate responses to science in The Simpsons*, Int'l J. of Sci. Educ., Part B., Abstract, available at http://www.tandfonline.com/doi/abs/10.1080/21548455.2011.610134 (last visited 20 Oct. 2011). The research found that viewers' impression of science was influenced highly by their own personal and religious beliefs, historical knowledge, political persuasion, and exposure to other television programs. *Id.* The bottom line of this study was that the effects of seeing science integrated in the context of a television fictional program, if any, were neither linear or predictable. Another study subjected mock jurors, who viewed an actual recorded criminal trial, to a battery of questions aimed at identifying the factors involved in evaluating the information presented in the trial.[4] Dante E. Mancini, *The CSI effect reconsidered: is it moderated by need for cognition?*, N. Am. J. Psychol. (Mar. 2011). The results of this study indicated that, although viewership of forensic-themed television shows increased skepticism of scientific evidence favoring the prosecution's case, it did not influence the final verdict. The study, however, identified a psychological personality trait, need for cognition, as an important and determining factor that moderated the effect of viewership.[5]

---

4. In this study, the viewers were 217 college undergraduates who, after watching the trial, answered questions about their verdict preference, verdict reasoning, forensic television viewership and realism, and need for cognition.

5. Need for cognition is a measure of "one's tendency to engage in and enjoy effortful thought." The study theorizes that individuals with a high-level need for cognition will be more likely to organize and thoughtfully evaluate information, such as evidence presented at a trial. A high need for cognition, combined with high forensic television viewership, might encourage a juror to be more critical of the scientific

The results of this study indicate that additional studies are required to determine the exact causative factors related to a juror's perception and evaluation of evidence. Yet another scholarly paper found that exposure to crime drama was significantly and positively related to the belief that forensic evidence is infallible. Amber L. Ferris, *Examining the "CSI Effect": The Impact of Crime Drama Viewership on Perceptions of Forensics and Science* (Aug. 2011) (unpublished Ph.D. dissertation, Kent State University). Ms. Ferris also found a significant positive relationship between viewing crime dramas and the expectation of forensic evidence in every trial. *Id.*

Massachusetts added recently to its ongoing judicial discourse on the "CSI effect" in *Commonwealth v. Perez,* 460 Mass. 683, 954 N.E.2d 1 (2011), *see also Atkins,* 421 Md. at 466–67, 26 A.3d at 998. (explaining the Massachusetts view, found in *Commonwealth v. Seng,* 456 Mass. 490, 924 N.E.2d 285, 295–98 (2010), and *Commonwealth v. Bowden,* 379 Mass. 472, 399 N.E.2d 482 (1980), that there is little empirical evidence about the existence of the "CSI effect."). The issue in *Perez* was a question during jury voir dire that asked whether the jurors believed that "the Commonwealth is never able to prove a case beyond a reasonable doubt unless it presents scientific evidence to corroborate witness testimony."[6] *Perez,* 460 Mass. at 689, 954 N.E.2d 1. The defendant did not object timely to the jury instruction; therefore, the issue was unpreserved and the appellate court reviewed only for plain error. *Id.* The court found no abuse during voir dire because the questions were aimed at seating a jury that would

---

evidence presented at trial. A low need for cognition, combined with high forensic television viewing, might create a juror who views fictional science as realistic and therefore be less critical in evaluating the evidence presented at trial.

6. The format of similar questions varied during voir dire. Other forms were "Would you agree or disagree with this statement? In order to prove its case beyond a reasonable doubt, the Commonwealth always has to produce scientific evidence," and "If the Commonwealth did not produce scientific evidence, would you feel required to return a verdict of not guilty?" *Commonwealth v. Perez,* 460 Mass. 683, 689, 954 N.E.2d 1 (Mass.2011).

be capable of deciding the case without bias. *Perez*, 460 Mass. at 691, 954 N.E.2d 1. The form of questioning did not "suggest to potential jurors that a lack of scientific evidence could not be considered in determining whether a reasonable doubt existed as to the defendant's guilt." *Id.* (citing *Commonwealth v. Young*, 73 Mass.App.Ct. 479, 899 N.E.2d 838, 844 (2009)). Noting the tension between allowing the scientific evidence question in voir dire, but excluding it from jury instructions, as was the case in *Bowden*, the court cautioned that trial judges should exercise caution in composing the voir dire questions so as not to frame them in a way that presumes or insinuates guilt of the defendant. *Id.* As shown in the most recent studies and *Perez*, the scholarly research on, and judicial view of, the "CSI effect" remains as inconsistent and inconclusive as it was when we decided *Atkins*.

## C. The Present Case

██ Without resolving whether the form of the jury instruction given in the present case was a correct statement of law, it nonetheless was given improperly in the circumstances of the case. Also, the subject law was covered fairly by other given instructions. The pertinent jury instruction at issue in the present case is identical to the instruction given in *Atkins*; however, the similarities end there. In *Atkins*, we found that the "missing" forensic or other evidence connecting the alleged weapon to the crime was "of critical importance" to the State's case, as there was little evidence linking the foot-long knife recovered from Atkins's night stand with the crime. *Atkins*, 421 Md. at 450, 26 A.3d at 988. Here, the lack of forensic evidence, i.e., DNA or fingerprints corroborating Stabb's asserted misconduct towards Kaylen J., may not have been as critical to the strength of the State's case because of the victim's testimony and the circumstantial evidence supplied by the State's other witnesses. In closing, although defense counsel commented on the lack of physical evidence, the overwhelming majority of her argument focused on the State's reliance on a single child witness, conflicting statements of the State's other witnesses, motive of Melissa R. and

Jane R. to influence Kaylen J.'s statements, Stabb's alibi, and possibility of an alternative assailant. Nonetheless, the lack of scientific evidence was an integral part of the defense's theories.

Another problem with the "anti-CSI effect" jury instruction in the present case is that it was given preemptively, i.e., before any explicit argument by the defense on the absence of DNA or fingerprint testing of Kaylen J. or her clothing. Well before closing arguments, the trial court hinted that it might deliver the State's "anti-CSI effect" instruction, after defense counsel first questioned Sullivan as to whether any physical evidence could have been obtained from a SAFE of Kaylen J. Later, during a recess in the defense's case, the trial court revisited the issue and allowed defense counsel to state and explain her objection to the proposed jury instruction. Defense counsel argued that it would be improper to give the jury instruction unless the court needed to cure a "robust and vehement" closing argument that "harped" on the lack of scientific evidence.[7] Defense counsel was correct. Stabb's defense argued properly and without undue emphasis the lack of corroborating physical evidence of the crime, and questioned Detective Seichepine and Sullivan as to the likelihood of the existence of such evidence and why a SAFE was not performed, but did not "harp" impermissibly on the lack of physical evidence in its case-in-chief or during closing arguments. In fact, the main thrust of Stabb's defense rested on an alibi theory. His closing arguments focused also on numerous ways the defense contended that the State had failed to satisfy its reasonable doubt burden, only one of which was its failure to perform a SAFE. When the defense did allude to the lack of corroborating physical evidence, its comments were "legitimate, brief, and reasonable," as in *Atkins*. These factors distinguish the present case from *Evans*.

It was up to the jury to weigh the absence of physical evidence corroborating Stabb's alleged assault on Kaylen J.,

---

7. As in *Atkins*, the lack of the "robust and vehement closing arguments of counsel" distinguishes the present case from *Evans*.

Stabb's alibi defense, and the testimony of the other defense witnesses. Further, Stabb did not advance a "missing evidence" argument that implied that "missing" evidence would favor him; rather, counsel alluded to the absence of corroborating physical evidence because the State chose not to administer a SAFE. The State responded, during recross-examination of witnesses and in closing arguments, to defense counsel's implication regarding the lack of a SAFE, i.e., why a SAFE was not administered and the unlikelihood that a SAFE, had it been administered, would have yielded testable DNA or fingerprints. Rebuttal by the State was the proper approach. When the trial judge injected the pertinent instruction into the jury's calculus, it had more "force and effect than if merely presented by counsel," and could have influenced impermissibly the drawing by the jury of inferences regarding the absence of physical evidence. *Cost v. State*, 417 Md. 360, 381, 10 A.3d 184, 197 (2010). In giving the "anti-CSI effect" instruction to the jury, the trial court directed effectively the jurors not to consider the absence of a SAFE or corroborating physical evidence. The trial court invaded impermissibly the province of the jury deliberations with the given "anti-CSI effect" instruction under the circumstances.

The "anti-CSI effect" jury instruction given, in the circumstances of this case, was improper because it relieved the State of its burden to prove Stabb was guilty beyond a reasonable doubt, invaded the province of the jury, and, thus, violated Stabb's constitutional right to a fair trial. Therefore, we reverse the judgment of the Court of Special Appeals and remand to that court with directions to reverse the judgment of the Circuit Court and remand this case to the Circuit Court for a new trial, consistent with this opinion.

In closing and with a nod to the future, we observe that, because of the currently inconclusive state of the scholarly legal and/or scientific communities' research, taken as a whole, regarding whether such a phenomenon as the "CSI effect" exists, the use of "anti-CSI effect" jury instructions (especially when given preemptively before closing arguments or other-

wise improper defense questioning or commentary during trial regarding the absence of scientific evidence as part of the State's case) is fraught with the potential for reversible error. To the extent that such an instruction is requested, its use ought to be confined to situations where it responds to correction of a pre-existing overreaching by the defense, i.e., a curative instruction. We may revisit this view at such time as a proper case comes before us where it can be demonstrated by appropriate scholarly research that a "CSI effect" has been found to exist by the relevant legal and/or scientific communities and its scope and effect can be relied upon to tailor an appropriate response through voir dire questions and/or jury instructions.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY WICOMICO COUNTY.**